CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendants
Guam Seventh-day Adventist Clinic
and Guam-Micronesia Mission



**FILED**
DISTRICT COURT OF GUAM
JAN 20 2006
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| JULIA BORJA EMMANUEL,<br><br>        Plaintiff,<br><br>vs.<br><br>GUAM SEVENTH-DAY ADVENTIST<br>CLINIC, GUAM-MICRONESIA MISSION,<br>MICHAEL MAHONEY, and DOES 1 through<br>10,<br><br>        Defendants. | CIVIL CASE NO. CIV03-00030<br><br><br>**DEFENDANTS' POST-TRIAL BRIEF;<br>DECLARATION OF SERVICE** |

## DEFENDANTS' POST-TRIAL BRIEF

4842-6370-9184.1.037391-00004



ORIGINAL

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................. 1

II. FACTUAL DISCUSSION .................................................................................. 1

    A.    The Parties ................................................................................................... 1

    B.    The Organization of the Clinic and the Mission........................................ 2

    C.    Employees & Employee Benefits............................................................... 2

    D.    Plaintiff....................................................................................................... 4

    E.    Other Employees ........................................................................................ 5

    F.    The Board's Decision.................................................................................. 8

    G.    Plaintiff's Lawsuit and Claims................................................................. 14

    H.    Plaintiff's Position Subsequent to the Filing of the Lawsuit.................... 14

    I.    Plaintiff's Emotional Distress .................................................................. 15

    J.    Workforce Confidentiality Agreement ..................................................... 16

III. LEGAL DISCUSSION..................................................................................... 17

    A.    Plaintiff Has Not Proven Disparate Treatment........................................ 17

            1.    The McDonnell Douglas Burden-Shifting Approach............................. 17

            2.    The Clinic Has Met its Burden of Producing a Legitimate Nondiscriminatory Business Reason for Reclassifying Plaintiff ............. 18

            3.    Plaintiff Has Not Persuaded the Court by a Preponderance of the Evidence that Her Race Motivated the Clinic to Reclassify Her ............. 19

                    a.    Preliminary Discussion on Decisions Made by Multiple Actors........................................................................................... 19

                    b.    Plaintiff Presented No Evidence that the Clinic Discriminated Against Her, or Was Influenced by Any Discriminatory Motives................................................................ 20

                    c.    Pattern-or-Practice Evidence ........................................................ 22

                          (1)    The Board's July 10, 2003 Decision ................................. 22

                          (2)    The Clinic's Treatment of IDEs........................................ 24

                           (3)    The Clinic's Treatment of Locals and Non-locals ............ 25

                    d.    Plaintiff Fails to Demonstrate that the Financial Crisis Is Pretextual..................................................................................... 28

B.    Plaintiff Has Not Proven Disparate Impact ........................................................29

C.    Plaintiff is Not Entitled to Damages..................................................................33

    1.    Plaintiff's Misconduct Limits an Award of Back Pay and Precludes Front Pay and Reinstatement..................................................................33

    2.    An Award of Back Pay Would be Speculative........................................35

    3.    Plaintiff Failed to Mitigate Damages and Is Therefore Not Entitled to Back Pay, Front Pay, or Reinstatement...............................................35

    4.    Plaintiff Is Not Entitled to Compensatory Damages for Emotional Distress ...............................................................................................36

        a.    The Court Should Afford No Weight to the Testimony of Dr. Pamina Hofer.......................................................................36

        b.    Plaintiff Failed to Mitigate Her Emotional Distress....................37

    5.    Plaintiff is Not Entitled to Punitive Damages .........................................38

    6.    Plaintiff's Compensatory and Punitive Damages Are Capped at $100,000 ...............................................................................................39

    7.    Attorneys' Fees .....................................................................................40

IV.    CONCLUSION ............................................................................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ahmed v. American Red Cross,*
218 F.3d 932 (8th Cir. 2000) .............................................................................................24

*Beaver v. Rayonier, Inc.,*
200 F.3d 723 (11th Cir. 1999) ...........................................................................................24

*Blakey v. Cont'l Airlines, Inc.,*
992 F. Supp. 731 (D.N.J. 1998)..........................................................................................37

*Clearwater v. Indep. Sch. Dist. No. 166,*
231 F.3d 1122 (8th Cir. 2000)............................................................................................21

*Cotton v. City of Alameda,*
812 F.2d 1245 (9th Cir. 1987).............................................................................................32

*English v. Colo. Dept. of Corr.,*
248 F.3d 1002 (10th Cir. 2001) ..........................................................................................20

*Ford Motor Co. v. EEOC,*
458 U.S. 219 (1982)..........................................................................................35, 36, 37

*Graefenhain v. Pabst Brewing Co.,*
827 F.2d 13 (7th Cir. 1987)................................................................................................23

*Herrero v. St. Louis Univ. Hosp.,*
109 F.3d 481 (8th Cir. 1997)..............................................................................................21

*Intern. Bhd. of Teamsters v. United States,*
431 U.S. 324 (1977) ..........................................................................................................25

*Johnson v. Flowers Indus., Inc.,*
814 F.2d 978 (4th Cir.1987)...............................................................................................40

*Kolstad v. American Dental Ass'n,*
527 U.S. 526 (1999) ..........................................................................................................38

*Llampallas v. Mini-Circuits, Lab, Inc.,*
163 F.3d 1236 (11th Cir. 1998)..........................................................................................20

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973).........................................................................................17, 18, 28

*McKennon v. Nashville Banner Publ'g Co.,*
513 U.S. 352 (1995) ..........................................................................................33, 34, 35

*Montana v. First Fed. Sav. & Loan Ass'n,*
869 F.2d 100 (2d Cir. 1989) ..............................................................................................23

*Obrey v. Johnson,*
400 F.3d 691 (9th Cir. 2005)..............................................................................................25

*Penk v. Oregon State Bd. of Higher Educ.,*
816 F.2d 458 (9th Cir.1987)...............................................................................................25

# TABLE OF AUTHORITIES
## (continued)

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ..................................................................................................20, 21

*Rose v. Wells Fargo & Co.,*
902 F.2d 1417 (9th Cir. 1990) ..............................................................................30

*Russell v. Microdyne Corp.,*
65 F.3d 1229 (4th Cir. 1995) ................................................................................34

*Shager v. Upjohn Co.,*
913 F.2d 398 (7th Cir. 1990) ................................................................................20

*Shutt v. Sandoz Crop Protection Corp.,*
944 F.2d 1431 (9th Cir. 1991) ..............................................................................30

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) ..............................................................................................18

*Stanfield v. Answering Serv., Inc.,*
867 F.2d 1290 (11th Cir. 1989) ............................................................................36

*Stender v. Lucky Stores, Inc.,*
57 FEP 1431 (N.D. Cal. 1991) ..............................................................................25

*Swinton v. Potomac Corp.,*
270 F.3d 794 (9th Cir. 2001) ................................................................................38

*Tallarico v. Trans World Airlines, Inc.,*
881 F.2d 566 (8th Cir. 1989) ................................................................................37

*Texas Dept. of Comty. Affairs v. Burdine,*
450 U.S. 248 (1981) ........................................................................................18, 28

*U.S. Postal Serv. Bd. of Governors v. Aikens,*
460 U.S. 711 (1983) ..............................................................................................19

*Watson v. Fort Worth Bank & Trust,*
487 U.S. 977 (1988) ........................................................................................30, 32

*Watson v. Gulf and W. Indus.,*
650 F.2d 990 (9th Cir. 1981) ................................................................................39

*Wyvill v. United Cos. Life Ins. Co.,*
212 F.3d 296 (5th Cir. 2000) ................................................................................26

**Statutes**
42 U.S.C. § 1981(a)(1) ..........................................................................................38

42 U.S.C. § 1981a(b)(1) ........................................................................................38

42 U.S.C. § 1981a(b)(3) ........................................................................................39

42 U.S.C. § 2000e-5(g) ..........................................................................................37

**Rules**
Fed. R. Civ. P. 37(c)(1) ..........................................................................................37

## I.   INTRODUCTION

In the first few months of 2003, Defendant Guam Seventh-day Adventist Clinic, a non-profit religious organization, came to grips with an ongoing financial crisis and instituted the first wave of more than forty cost-savings measures identified by a specially appointed committee as ways to reduce expenses. At this point in time, the Clinic was on the verge of not being able to meet payroll. One such cost saving measure resulted in the reclassification of Plaintiff's position from a "Director" to a "Manager" carrying with it a reduction of fringe benefits. However, Plaintiff's annual salary, approximately $46,700, remained essentially the same. Plaintiff filed this lawsuit, claiming to be a victim of racial discrimination, but provided no evidence at trial to support her claims that discriminatory motives caused her reclassification, or that the Clinic "manufactured" its financial crisis solely to discriminate against her. The lack of evidence defeats Plaintiff's discrimination claims, and must result in a judgment in favor of Defendants.

## II.   FACTUAL DISCUSSION

The following factual discussion outlines the factual evidence presented at trial.

### A.   THE PARTIES

1.   Plaintiff is Chamorro, the ethnicity of the indigenous people of Guam.

2.   Plaintiff was employed by Defendant Guam Seventh-day Adventist Clinic (the "Clinic") as its Human Resources ("HR") Director from September 1, 1992 until September 1, 2003.

3.   The Clinic is a medical facility on Guam that provides medical and dental services. Revenue at the Clinic is generated by its healthcare providers.

4.   The HR Director is not a healthcare provider position, and does not generate revenue for the Clinic.

B. THE ORGANIZATION OF THE CLINIC AND THE MISSION

1.     The Clinic is a subsidiary of Defendant Guam-Micronesia Mission ("Mission").   At all periods pertinent to this case, Pastor Remenster Jano, a United States citizen of Ponapean origin and ethnicity, acted as the Mission President.

2.     The Clinic is financially independent of the Mission, and when the Clinic experiences financial problems, the Mission does not provide the Clinic with financial assistance.

3.     The Clinic and the Mission are non-profit Seventh-day Adventist organizations.  Seventh-day Adventist organizations globally are organized under the umbrella of the Seventh-day Adventist General Conference.

4.     The General Conference is divided up into thirteen global and regional Divisions.  The Mission is within the General Conference's Southern Asia-Pacific Division.

5.     The Clinic employs 188 employees.

C. EMPLOYEES & EMPLOYEE BENEFITS

1.     The Clinic employs Interdivision Employees ("IDE"), contract employees, and local resident hires.

2.     At the Clinic, IDEs are healthcare professionals, primarily physicians, who maintain residency in a Division other than the Southern Asia-Pacific Division and travel to and reside temporarily on Guam to work for the Clinic.

3.     Because it is a Seventh-day Adventist organization, the Clinic requires that its healthcare providers, regardless of whether they are IDEs or hired locally, belong to the Seventh-day Adventist faith.

4.     The Clinic experiences substantial difficulty recruiting healthcare providers and doctors of the Seventh-day Adventist faith from the local Guam community.  It would not be a stretch to say that it is impossible to fill the Clinic's healthcare provider needs

with only local hires. This is a function of the fact that, until recently with one exception, persons with the requisite qualifications were simply unavailable on Guam. The Clinic therefore recruits a majority of its healthcare providers from other Divisions. Most IDEs at the Clinic originate from the North American Division in particular, because healthcare providers practicing in Guam must be licensed in the United States.

5.    Providers working at the Clinic, whether IDEs or not, make anywhere from one-third to one-half of their market salary in the United States. For example, the evidence at trial revealed that one doctor, Brian Bates, earned a salary of $57,000 at the Clinic but has been offered $350,000 to work in the United States. In order to attract and successfully recruit healthcare professionals from other Divisions who would be making twice as much or more in the United States, the Clinic offers an IDE benefits package that includes a housing allowance, a tax subsidy, vacation time with the cost of off-island travel paid, and tuition benefits for dependents.

6.    The Clinic finds it absolutely necessary to offer these packages in order to allow and assist the healthcare professionals to work in Guam, while they are displaced from their families and their homes in the United States. In essence, the IDE package provides IDEs support for maintaining two homes, while earning less than market wages.

7.    Local resident hires are employees hired from the Guam community at large. Local resident hires receive a standard yet generous benefit package, which includes, among other items, health and dental insurance and a life insurance option. It is self-evident that local resident hires are not supporting another household elsewhere in the world.

8.    Contract employees hold employment contracts with the Clinic, which may include benefits in addition to the standard local hire benefit package, and may be

comparable to the IDE benefit package. Contract employees negotiate their contracts with the Clinic on a case-by-case basis. For example, the current Clinic Administrator, though a resident of Guam, negotiated a contract which includes IDE-type benefits.

9.     Michael Mahoney became the Clinic's Administrator in mid-2001. At that time, the ethnic breakdown of the Clinic's non-healthcare provider staff and management was: 51% Filipinos, 20% Chamorros, 14% Caucasians, 6% Pacific Islanders, 3% Caucasian-Chamorros, 2% African-American, 2% other, 1% mixed and 1% Chinese. Ex. D. Among healthcare providers, the ethnic breakdown was 25 Caucasians, 1 Nigerian, 2 Filipinos, 2 Hawaiians, 5 Koreans, 1 Peruvian, 2 Japanese, and 2 Indonesians. Ex. D.

10.     In mid-2004 when Mr. Mahoney ceased being Administrator, and after Plaintiff brought this lawsuit, the ethnic breakdown of the Clinic's non-healthcare provider staff and management was: 51% Filipinos, 22% Chamorros, 15% Caucasians, 6% Pacific Islanders, 1% African-American, 2% other, 2% mixed and 1% Chinese. Ex. E. Among healthcare providers the ethnic breakdown was: 22 Caucasians, 1 Nigerian, 3 Filipinos, 1 Hawaiian, 5 Koreans, 1 Peruvian, 2 Japanese, 2 Indonesians, and 1 female Chamorro. Ex. E.

11.     Pastor Jano testified that the Clinic encourages local leadership.

D.     PLAINTIFF

1.     As HR Director, Plaintiff was a locally hired contract employee. Her benefits included car depreciation assistance, car insurance, a utility allowance, tuition subsidies for her children's education, vacation time, subscriptions to professional journals, continuing education with expenses covered for tuition and travel to attend a continuing education course, and a homeowner's allowance. These benefits were comparable to IDE benefits.

2.     Plaintiff took advantage of the benefits listed in her Employment Agreement. While Plaintiff embellished her testimony by claiming she had to "beg" for certain

benefits to which she was entitled, such as the utility allowance, the evidence at trial demonstrated that Plaintiff's claim does not ring true. Rather, the evidence showed that the Clinic provided those benefits as and when they were due. *See* Exs. CC-FF, HH-SS (Plaintiff's pay stubs).

3.      The Clinic and the Mission continually commended Plaintiff for her performance, placed confidence in her leadership abilities, and awarded her regular incremental raises. *See, e.g.,* Exs. 7, 14-17, 20, 62. She was appointed to the Administrative Council. She was entrusted with important responsibilities, such as negotiating insurance contracts, which, Plaintiff testified, required a high level skill and understanding of the insurance industry. She was also an invitee on the Mission's Executive Committee. She was voted to act as the Mission's Children's Minister and to be a spiritual leader for employee retreats. Plaintiff testified that in order to obtain these appointments, the appointee must be competent and a good employee.

4.      Plaintiff testified that Chamorros are held to the same performance standards as employees of other ethnicities at the Clinic.

5.      In 2003, Plaintiff reported to Michael Mahoney, the Clinic Administrator. Two years prior, on September 21, 2001, Mr. Mahoney commented that it is difficult to take aggressive administrative action against Plaintiff because of her being Chamorro and because of Adventist politics. Ex. M. Kerstan Reese testified (by deposition admitted into evidence) that this had nothing to do with skin color or race.

E.      OTHER EMPLOYEES

1.      Under Mr. Mahoney's administration, the Clinic was able to hire a Chamorro physician of the SDA faith and a resident of Guam, Lisa Flores. Dr. Flores is a contract employee and has benefits similar to an IDE package.

2.      In some cases, the Clinic has offered IDE benefit packages to persons who

do not immediately transfer from another division into the Clinic. Jolene Brecht, for example, has a dental hygiene degree, and is a registered and licensed dental hygienist. She is a healthcare provider and therefore generates revenue for the Clinic. She is a Caucasian who relocated to Guam from the United States, and was offered IDE status a few years after she began working at the Clinic. Mrs. Brecht declined initial offers to become an IDE, but ultimately accepted based on the Clinic's need for a permanent dental hygienist. Mrs. Brecht testified that her salary at the Clinic amounts to *one-half to two-thirds* of what she would earn in California and Colorado, where she is also licensed to practice, and that the IDE benefits help make up the pay disparity.

3. Jordan Urban is the Clinic's Chief Accountant. Mr. Urban, a Caucasian, came from another General Conference Division to work at Adventist World Radio, a subsidiary of the Mission, but did not qualify for IDE benefits until he began working for the Clinic, ten years after his arrival on Guam. Notably, after ten years working in inferior low-pay positions, Mr. Urban was finally able to qualify for and take on the Chief Account position at the Clinic, and in doing so, received the IDE level benefits as part of his compensation package.

4. Frances Mantanona, a Chamorro, was employed in several administrative positions at the Clinic from 1990 until 2000. In those positions, Mrs. Mantanona held an employment contract allowing benefits similar to an IDE package. In 1999, Mrs. Mantanona was unable to meet the performance expectations of the then-Administrator, Don Weidemann. As a result, the Clinic Board reduced Mrs. Mantanona's duties, and modified her benefit package to be similar to other local hire salaried employees. Mrs. Mantanona testified that the Clinic did not reduce her benefits because she was Chamorro, and that she has never filed a discrimination claim against the Clinic. Despite constant badgering on cross-examination, Ms. Mantanona was steadfast in her testimony that racial discrimination played no part in her decision to seek

employment at another healthcare clinic on Guam. Despite being the HR Director during Mrs. Mantanona's reclassification, Plaintiff never reported to Clinic management her so-called "beliefs" that the Clinic discriminated against Mrs. Mantanona.

5.   Violet Cruz, a female Caucasian married to a Chamorro, retired as a nurse practitioner at the Clinic. Plaintiff introduced evidence that Mrs. Cruz had difficulty obtaining a retirement package that would cover benefits for her family. However, Mrs. Cruz testified that at no time during the retirement application process did she report that her husband was Chamorro. Moreover, Mrs. Cruz easily explained to the Court that the confusion surrounding her retirement package stemmed from the fact that her husband had a similar retirement package, and that the confusion was amicably resolved after a short while.

6.   Roger Natividad, a Filipino, acted as the Clinic's Maintenance Director. Mr. Natividad was reclassified to Maintenance Supervisor in response to complaints by Mr. Weidemann of his smoking at the non-smoking clinic facility, and his poor performance on jobs at the Clinic's housing. Mr. Weidemann insisted on terminating Mr. Natividad, but was convinced by the then-Associate Administrator, Michael Mahoney, to instead reclassify Mr. Natividad and reduce his benefits. While the reclassification eliminated certain benefits, it maintained his wage at the same level as his annual salary earned as the Maintenance Director, roughly $38,000. Prior to his reclassification, Mr. Natividad received IDE-comparable benefits including the full payment of his daughter's college tuition at Loma Linda University. Again, as with the so-called "discrimination" by Mr. Weideman against Ms. Mantanona, despite being the HR Director during Mr. Natividad's reclassification and preparing the paperwork to implement the change, Plaintiff never reported or otherwise noted her "beliefs" that the Clinic discriminated against Mr. Natividad. Self-serving after-thoughts at the time of trial do not equal proof of

discrimination. Mr. Mahoney testified that Plaintiff only expressed concerns that Mr. Natividad was having problems with Mr. Weidemann. Mr. Natividad has since retired from working at the Clinic, and although his poor performance, as well as sleeping on the job, became issues towards the end of his employment, the Clinic allowed Mr. Natividad to retire with full retirement benefits.

7.     The Clinic employed Richard Brecht, a Caucasian, as a local hire maintenance technician. As a result of removing drugs from the Clinic, as disciplinary measures, the Clinic demoted and reclassified Mr. Brecht, required him to attend rehabilitation treatment and pay restitution, and reduced his pay. Mr. Brecht was never a Director at the Clinic.

8.     Mrs. Mantanona, now Administrator at the Clinic since 2004, testified that there is no general prohibition against providing Chamorros with IDE benefits because they are Chamorro. For example, George Ulloa, a male Chamorro, works in another General Conference Division, and has an IDE package.

9.     Dr. Samuel Danian is a Nigerian healthcare provider at the Clinic and is given the same IDE package as the Caucasian doctors at the Clinic.

F.     THE BOARD'S DECISION

1.     In the spring of 2003, the Clinic Board appointed a special committee to find ways to cut costs at the Clinic due to a financial crisis. That crisis began in the years before 2003. In mid-2002, for example, the Clinic had a net operating loss of over $800,000.

2.     A substantial portion of the operating loss was not within the Clinic's control. Rather, large losses were in no small part due to the lasting effects of the bankruptcy of a local insurance company, GMHP, to which a large number of patients seeking treatment at the Clinic belonged. The Clinic continued treating patients in spite of the lack of insurance coverage by GMHP. Mr. Mahoney testified that eventually, GMHP paid about thirty to thirty five cents

on the dollar on the $1,000,000-plus amount owed to the Clinic. The Clinic was also recovering from a loss of business resulting from a deadly shooting at the Clinic in 2001.

3.      That negative financial trend that began in prior years continued through 2003. By mid-2003, the Clinic continued to operate at a loss of over $251,000. Mr. Mahoney testified that the Clinic's financial condition made it difficult to upgrade equipment, invest in infrastructure, and recruit healthcare providers. Pastor Jano testified that at one point time, Clinic officials went to the Mission asking for prayers to help the Clinic meet payroll. Violet Cruz, a Clinic Board Member, similarly confirmed with her uncontroverted testimony that the Clinic was on the brink of not meeting payroll.

4.      The documentary evidence was similarly compelling. The Clinic's audited financial statement confirmed that the Clinic's expenses in 2003 of $14,239,083 outweighed its income of $14,092,574. Ex. GG at 4.

5.      In the spring of 2003, Mr. Mahoney and Kerstan Reese, the Clinic's Chief Financial Officer ("CFO"), reported the dire financial condition of the Clinic to the Board.

6.      Violet Cruz testified that during the Board's discussions of the Clinic's financial situation, the Board was informed that Plaintiff earned more than one of the Clinic's doctors. The Board quickly concluded that doctor salaries could not be cut because they were already earning only a fraction of what they could earn in private practice. The Board also heard concerns regarding complaints that Plaintiff demeaned staff and delayed paperwork. In view of the financial condition of the Clinic, Plaintiff's high level of total compensation, and the issues surrounding performance, the Board questioned whether it was "getting its money's worth" from Plaintiff.

7.      The Board commissioned an Ad Hoc Committee to develop cost-cutting

measures, and to research the market value of Plaintiff's position. The Ad Hoc Committee was comprised of Mr. Urban, Mr. Reese, an African-American, Dr. Bevan Geslani, a Filipino, and Mr. Mahoney, a Caucasian. Dr. Geslani acted as Chairman of the Ad Hoc Committee.

8. On May 28, 2003, based on a list prepared by Dr. Geslani, the Ad Hoc Committee devised a number of immediate measures to cut costs at the Clinic. Those immediate measures included basing the salary and benefits of the HR Director position on the market wage; replacing the nursing manager position with a supervisory position with part-time nursing duties; eliminating the customer service position; instituting a hiring freeze; re-negotiating janitorial contract services; cross-training employees to become versatile in several positions; eliminating overtime and temporary work; eliminating paid paternity leave; and implementing a 72-hour pay period. Ex AA.

9. The Ad Hoc Committee also recommended a number of intermediate/mid-range and long-term strategic cost-savings measures for the future. The intermediate/mid-range plans included, among others, studying the IDE status for a dental hygienist, reviewing the staffing level of the dental clinic and the advertising budget, eliminating floating holidays and the housing subsidy for the Guam Adventist Academy administrator, and studying the costs of mission trips for providers. Ex. AA.

10. The long-term strategic plans included capping continuing education funds, obtaining bulk discounts for medical and office supplies, and scanning medical records.

11. The Ad Hoc Committee then sent its recommendations to the Ad Council, comprised of the Clinic's administrators, for review and response. The Ad Council adopted a number of the Ad Hoc Committee's immediate recommendations, and forwarded other recommendations for action by the Board. Mrs. Mantanona testified that the implementation of

the immediate cost-savings measures have continued, with success, during her current administration.

12.    Plaintiff was a member of the Ad Council.

13.    Though the Ad Council deferred the decision on reclassifying the HR position, Plaintiff never reported to Clinic management that the reclassification would be discriminatory.

14.    On July 10, 2003, after discussing and reviewing the CFO's financial report detailing a financial crisis at the Clinic, the Board unanimously voted to reclassify the HR Director position and reset the position's salary based on a study of the market wage to be conducted by the Administrator and Medical Director. The Board's reclassification decision meant that Plaintiff would receive the standard local resident hire benefit package as opposed to the IDE-comparable benefits.

15.    During the July 10, 2003 vote, Pastor Jano, Violet Cruz, Reggie Leach, Michael Mahoney, Kerstan Reese, Dr. Geslani, and Dr. Richard Ludders comprised the Board.

16.    Other recommendations adopted by the Board at the July 10, 2003 meeting included studying the janitorial services contract, reclassifying the Administrative Secretary to an hourly position, and not filling the position of the CFO, who had been asked to resign and return to a stateside position ("permanent return") where he would not receive the IDE level of benefits. Ex. A. The Board also voted to retain the services of Mr. Mahoney as Administrator and Mr. Urban as Chief Accountant. Mr. Mahoney did not participate in the vote regarding his position, and had in fact offered to resign.

17.    Reclassifying the Administrative Secretary position resulted in a cost savings because the Administrative Secretary at that time, Eunice Wresch, was not always busy

with work and had "down" periods. She was also undergoing cancer treatment. The Clinic therefore saved costs during the hours Mrs. Wresch was not working.

18.   Not filling the CFO position resulted in a cost savings of $90,000.

19.   All witnesses who were present at the July 10 Board meeting, including Violet Cruz, a Caucasian married to a Chamorro, Remenster Jano, a Ponapean, and Mr. Mahoney, testified that the vote was in no way motivated by Plaintiff's race or gender.

20.   The Board did not consider cutting the wages or benefits of its healthcare providers because it feared the providers would leave the Clinic in light of the already gross disparity between their current salaries and what they could earn in the United States. The Board was also concerned that it would have difficulty recruiting healthcare providers if it made further cuts to the providers' salaries and benefit packages.

21.   Violet Cruz testified that if it were not for the financial crisis, the Board would not have had to reclassify Plaintiff or the Administrative Secretary.

22.   In order to determine the market wage on Guam for an HR Manager position, Mr. Mahoney contacted a competitor, Pacificare, and another company in the healthcare industry, Staywell, about the salary ranges of its HR directors. These two organizations were the only healthcare organizations on Guam similar in size to the Clinic. He learned from his contacts that $42,000 to $47,000 was the appropriate salary range. Mr. Mahoney also learned that of the two HR directors at Pacificare and Staywell, one had a master's degree in HR and another had a bachelor's degree. Plaintiff held no post-high school degree.

23.   While Mr. Mahoney did not compare the particular duties and responsibilities of all three HR directors, Plaintiff herself testified that had she been contacted by another clinic under similar circumstances, it would have been improper for her to have divulged

information about the duties and responsibilities of the Clinic's HR Director.

24.     Mr. Mahoney also considered the impact of the benefit reduction to Plaintiff. At the time Plaintiff's benefits were reduced, both of her sons had completed their schooling, thus, Plaintiff no longer utilized the educational allowance benefit for her dependents. Incredibly, at trial Plaintiff alluded to the "possibility" of adopting children who could utilize the benefit.

25.     Based on this market study and the consideration of the impact to Plaintiff, Plaintiff's salary was set at $46,000, the high end of the salary range for HR directors having considerably more formal education than Plaintiff, and she received the standard local hire benefits. A salary of $46,000 was roughly equivalent to what she received as the HR Director.

26.     The Clinic saved costs as a result of reducing Plaintiff's benefits. For example, the elimination of her homeowner's allowance saved the Clinic *$1,350 per month,* roughly equivalent to a low range salary for someone else.

27.     In order to accommodate Plaintiff's reduction in benefits, the Clinic also decreased Plaintiff's responsibilities in no small way. In particular, Plaintiff was no longer responsible for administering the co-pay insurance plan. Both Plaintiff and Mr. Mahoney testified that this task was difficult and time-consuming.

28.     The Clinic has instituted a number of the intermediate-range measures proposed by the Ad Hoc Committee to effect cost savings, including increasing the workload of the dental hygienist, decreasing the number of staff at the Wellness Center, eliminating the advertising budget, lumping sick leave and regular leave into one category of leave time, and discontinuing the allowance of compensatory time.

29.     The Clinic has also instituted many of the Ad Hoc Committee's proposed

long-term measures. The Clinic has amortized its providers' education loans, which the Clinic agrees to pay as a benefit, over a longer period of time, thereby decreasing the Clinic's immediate payments. The Clinic monitors the providers' leave requests to ensure full-level staffing at all times for the generation of maximum revenue, scans its medical records, eliminated all direct phone lines, and cross-trains employees in different departments. The Clinic also tasks each department to monitor its expenses. Overtime must now be approved and has been reduced significantly in order to save costs. Unnecessary purchases are no longer made.

30. As a result of implementing the immediate, mid-range and long-term cost-saving measures, the Clinic saved about $750,000 in expenses in 2004. Ex. GG at 4.

G. PLAINTIFF'S LAWSUIT AND CLAIMS

1. Plaintiff filed this Title VII action on August 7, 2003, and alleged that the Clinic discriminated against her on the basis of her race, ethnic origin and gender.

2. At closing arguments, Plaintiff conceded that she had not proven a case of gender discrimination.

H. PLAINTIFF'S POSITION SUBSEQUENT TO THE FILING OF THE LAWSUIT.

1. After Plaintiff filed her lawsuit, Clinic management reviewed alternatives to Plaintiff continuing in her position as HR Manager.

2. Plaintiff was offered, and declined, a management position at the Clinic's Wellness Center, which is at a separate location from the Clinic. Ex. Z.

3. Plaintiff was also offered to be placed on administrative leave with full pay, which she accepted. Since being placed on administrative leave, Plaintiff has been compensated $103,902.88 for her position as HR Manager, which amounts to a salary of $15,337.80 for the last four months of 2003, plus $46,113.80 for 2004, and $42,451.20 for 2005

as of the time of trial.

      4.     The offer to be placed on indefinite administrative leave, with full pay, was not unconditional. Rather, the offer was in exchange for Plaintiff's agreement to attend classes at the University of Guam ("UOG") that would enhance her abilities in the field of HR and allow her to obtain a bachelor's degree in HR management. The Clinic offered to pay her tuition and classroom texts at UOG. In exchange, the Clinic required Plaintiff to provide transcripts demonstrating that she attended and completed the classes. Ex. Z. Alternatively, Plaintiff had the option to return to work at a position other than HR Manager pending the outcome of the lawsuit. Ex. Z.

      5.     Due to scheduling issues, Plaintiff attended Guam Community College in the fall of 2003, and UOG in the spring of 2004. There was no evidence offered or admitted at trial showing that Plaintiff attended school after the spring of 2004.

      6.     Plaintiff presented neither transcripts nor tuition statements for any completed classes. Plaintiff also never returned for work at a position other than HR Manager.

      7.     Mrs. Mantanona testified that the Clinic perceives Plaintiff's failure to attend classes and/or to provide transcripts for those classes, and her failure to return to work in the event she chose not to attend classes as per the agreement with the Clinic, Ex. A, to constitute abandonment of her job.

### I.    PLAINTIFF'S EMOTIONAL DISTRESS

      1.     Plaintiff presented evidence at trial that she suffers from emotional distress and feels socially isolated. She testified that she is unable to function in the same meaningful ways she did prior. She attributes her distress to the 2001 shooting and this litigation. Her husband also testified that her menopause causes her to feel dizzy and nauseated.

      2.     However, Plaintiff has retained her position as a deaconess at the SDA

Church, a meaningful position of no small import according to the evidence at trial, chose not to attend classes at UOG to utilize her free time, and refused a management level position at the Wellness Center.

3.    Though Dr. Pamina Hofer treated Plaintiff's emotional distress for several months during 2005, Plaintiff did not disclose her treatment with Dr. Hofer until thirty days prior to trial.

4.    Due to the late disclosure, Defendants were unable to depose Dr. Hofer prior to trial, or to procure their own expert to rebut Dr. Hofer's opinions and assist Defendants in preparing for Dr. Hofer's testimony.

J.    WORKFORCE CONFIDENTIALITY AGREEMENT

1.    On November 13, 2002, Plaintiff signed a Workforce Confidentiality Agreement, and agreed to keep secret all Patient and other Confidential Information. Ex. BB. Among other provisions, Plaintiff agreed not to "access or view any information" unrelated to her job, and not to "make any unauthorized transmissions, copies, disclosures . . . of . . . Confidential Information." Ex. BB. "Confidential Information" includes information contained within an employee's personnel record and privileged materials.

2.    However, numerous exhibits introduced and/or used at trial by Plaintiff were just such "Confidential Information," including personnel and privileged documents. *See* Exs. 21-23, 25-26, 28-29, 33, 50. During trial, Plaintiff's attorneys admitted that Plaintiff had furnished these exhibits, and that certain of them had never been produced in discovery to Defendants' counsel. There was uncontroverted testimony from Mrs. Mantanona that the Clinic did not give Plaintiff permission to transmit, copy, or utilize these documents for her personal purposes. Mrs. Mantanona testified that such records were kept under lock and key in a secure file room, and that access to the records was strictly limited to persons with proper authorization.

Plaintiff had no such authorization. Moreover, Plaintiff had not even been on Clinic premises, other than for healthcare, since August 2003. In the circumstances, it is telling that, at trial, Plaintiff failed to explain or divulge how she came into possession of such documents.

3. A violation of the Workforce Confidentiality Agreement may result in termination. Ex. BB. Mrs. Mantanona testified that she will recommend that the Clinic Board terminate Plaintiff because of the unauthorized disclosure and copying of Confidential Information for publication to, and use by, her attorneys before and during the trial..

## III. LEGAL DISCUSSION

### A. PLAINTIFF HAS NOT PROVEN DISPARATE TREATMENT.

#### 1. The *McDonnell Douglas* Burden-Shifting Approach.

To prove a Title VII disparate treatment case, Plaintiff must first establish a prima facie case (1) that she belongs to a racial minority or a protected group; (2) that she was qualified for her position; (3) that she was subject to adverse employment action; and (4) that she was treated differently from others similarly situated. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Plaintiff satisfies her prima facie case, the burden of production shifts to Defendants to provide a legitimate, non-discriminatory reason for the employment action. *Id.* If Defendants meet their burden of production, Plaintiff must then prove that the reasons given are pretext.

In spite of the burden-shifting approach established by *McDonnell Douglas*, in a Title VII disparate treatment case, the plaintiff always retains the overall burden to persuade the trier of fact that the defendants ***intentionally discriminated*** against her by a preponderance of the evidence. *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 253, 256 (1981).

2. The Clinic Has Met its Burden of Producing a Legitimate
   Nondiscriminatory Business Reason for Reclassifying Plaintiff.

Once Defendant meets its burden of production, "the *McDonnell Douglas* framework--with its presumptions and burdens--is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993). Because the burden-shifting framework is no longer relevant at this post-trial stage, as a preliminary matter and for organizational purposes, this discussion begins with examining whether Defendant met its burden of producing evidence of a legitimate nondiscriminatory business reason for reclassifying Plaintiff.

The Clinic has produced evidence that it experienced losses in the hundreds of thousands of dollars in the years prior to and during Plaintiff's reclassification. The Clinic's negative financial condition is evident by the Clinic's financial reports and financial audit, and confirmed by the testimony of Mrs. Cruz, Pastor Jano, Mr. Mahoney, and Mr. Reese, *the Chief Financial Officer and a witness called by and for Plaintiff!* Moreover, it is self-evident from the fact that, during several months of 2003, the Clinic's top officers and doctors, including Medical Director Bevan Geslani and Administrator Mike Mahoney, spent a substantial portion of their working hours focusing on the financial crisis and devising ways to solve it. This process involved two executive level committees and the Board of Directors. These intensive collective efforts are a far cry from a sudden individual decision to cut costs. Furthermore, reducing Plaintiff's benefits constituted one of more than forty cost-savings measures proposed, many of which have been implemented and remain implemented to this day. The evidence certainly is sufficient for the Court to find that the Clinic has satisfied its burden of producing evidence of a legitimate nondiscriminatory reason for reclassifying Plaintiff's position and to proceed on the central issue of discrimination.

3.   Plaintiff Has Not Persuaded the Court by a Preponderance of the Evidence that Her Race Motivated the Clinic to Reclassify Her.

a.   Preliminary Discussion on Decisions Made by Multiple Actors.

The Clinic's determination to reclassify Plaintiff culminated after several levels of group decision-making. At the lowest level, the suggestion to reclassify Plaintiff occurred during a brainstorming session between Dr. Geslani and Mr. Mahoney, in their capacities as members of the Ad Hoc Committee. The suggestion was then placed for consideration before the Ad Hoc Committee, comprised of six persons, which adopted the suggestion as one of the Ad Hoc Committee's forty-plus official recommendations. The Ad Hoc Committee forwarded the recommendation to the Ad Council, a group of six persons, and then eventually to the Board, which has seven members.

Importantly, the preeminent inquiry of whether discriminatory motives caused an adverse employment action does not differ regardless of whether a group of individuals or a single supervisor made the ultimate adverse employment decision. In any Title VII action, the plaintiff must demonstrate that discriminatory motives *vel non* laid at the heart of the employer's adverse employment decision. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. In other words, is the employer treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (internal citations omitted).

In examining the motives of a group of individuals, courts usually examine whether one of the decision-makers possessed an impermissible discriminatory motive, and exercised that motivation in influencing the other decision-makers. This concept is otherwise known as the "cat's paw." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In *Shager*, Judge Posner found that the defendant's career path committee's decision to discharge the plaintiff was tainted

by a supervisor's prejudice. *Id.* Other courts following the cat's paw model require a showing that the supervisor possessing discriminatory motives caused the adverse employment action. *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998); *English v. Colo. Dept. of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (plaintiff must show that decisionmaker followed the biased recommendation without an independent investigation).

Here, Plaintiff contends that Michael Mahoney improperly influenced the Ad Hoc Committee's recommendation and the Clinic Board's decision to reclassify Plaintiff. As will be shown below, Plaintiff's contention is exactly that and nothing more. No evidence links the existence of any alleged prejudice on Mr. Mahoney's behalf to the Ad Hoc Committee's recommendation and the Board's decision to reclassify Plaintiff.

      b.    <u>Plaintiff Presented No Evidence that the Clinic Discriminated Against Her, or Was Influenced by Any Discriminatory Motives.</u>

Plaintiff's sole evidence of Mr. Mahoney's alleged prejudice consists of a two year old statement that Plaintiff operated on a "local cultural mind set" and that "it is difficult to take any aggressive administrative action against her because of her being Chamorro." Ex. M. As Justice O'Connor commented in her concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989), discriminatory remarks may be probative of discrimination in the workplace, however, statements by decisionmakers unrelated to the decisional process itself do not satisfy a plaintiff's burden of proving that the adverse employment decision was based on illegitimate criteria. "Race and gender always 'play a role' in an employment decision in the benign sense that these are human characteristics of which decisionmakers are aware and about which they may comment in a perfectly neutral and nondiscriminatory fashion." *Id.*

A stray remark about a person's ethnicity does not automatically infer that a decision was determined "because of" her ethnicity. *Id.* Rather, Title VII *requires* proof by the plaintiff that

the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Id.* "Statements may constitute evidence of impermissible motive only when they are made by the decisionmakers in the termination process and reflect a discriminatory animus such that a jury could infer that it was a motivating factor in the termination process." *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 484 (8th Cir. 1997). *See also Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1127 (8th Cir. 2000) (decisionmaker's racist remarks must be sufficiently related to the adverse employment action).

Here, Plaintiff fails to demonstrate that (1) Mr. Mahoney had a discriminatory motive, and (2) that his discriminatory motive, if even existent, influenced the Ad Hoc Committee's recommendations and the Board's decisions. First, Mr. Mahoney's statement, occurring two years prior to the reclassification, is completely unrelated in time or subject matter to the reclassification. Plaintiff's own witness Kerstan Reese testified that no discrimination based on skin color or race was intended by Mr. Mahoney. There was no evidence presented that Mr. Mahoney generally possessed or exercised any discriminatory motives against Chamorros or even against Plaintiff in particular. In contrast, under his administration Mr. Mahoney employed a clear majority of Filipinos and Chamorros at the Clinic. Exs. D, E. He also hired a Chamorro healthcare provider when he was able to do so.

Moreover, a close examination of the statement itself reveals no discriminatory motive therein. The statement demonstrates Mr. Mahoney's hesitation to take any administrative action against Plaintiff because of the potential problems that may arise due to the Clinic's policy of encouraging local leadership. A hypothetical opposite statement, such as that he will take aggressive administrative action because she is Chamorro, infers a discriminatory motive. A statement indicating a hesitation to take any action against her, on the other hand, demonstrates

support of the Clinic's position on local leadership. In other words, the statement shows that Plaintiff's race motivated him *not* to take any aggressive administrative actions.

Second, Plaintiff fails to demonstrate how Mr. Mahoney's statement in September 2001 could have possibly prejudiced or influenced the Ad Hoc Committee or the Board in July 2003. Indeed, it is telling that at no point during the trial did any witness even hint at any influence on the part of Mr. Mahoney. Also, when the Clinic's survival depended on financial cuts, the Ad Hoc Committee and the Board did not use race to determine which employees would retain their benefits. The Ad Hoc Committee did not draw any distinction between Chamorros and non-Chamorros when it decided who would earn overtime, but rather eliminated overtime across the board. It did not rely on race when it recommended who would receive paid paternity leave, but rather eliminated all paid paternity leave regardless of race. It did not focus on anyone's race in determining who would have to work a 72-hour pay period but rather implemented it Clinic-wide. Finally, it never examined Plaintiff's or Eunice Wresch's race when it decided to reclassify both of them as a result of the financial cuts.

Mr. Mahoney's two-year old statement had no impact on Plaintiff's reclassification.

        c.        Pattern-or-Practice Evidence

Plaintiff also attempts to prove discrimination through a pattern or practice theory, comparing herself to other employees.

        (1)        The Board's July 10, 2003 Decision.

Plaintiff claims that she was treated differently from a number of non-Chamorros. As just discussed, however, the evidence demonstrated that Clinic employees at all levels and among all races were affected by the financial crisis. The Board reclassified the position of Administrative Secretary, then held by Eunice Wresch, a Caucasian, to an hourly position in order to save costs. Ex. A. The Chief Financial Officer position and the Customer Service

representative position were to remain unfilled. Exs. A, AA. The Nursing Manager was required to take on nursing duties in addition to her administrative duties. Ex. AA. The Clinic also eliminated paid paternity leave, which affected all staff, including the healthcare providers. Ex. AA.

Plaintiff infers that the Board's decisions not to reduce Michael Mahoney's and Jordan Urban's benefits establishes discrimination. Plaintiff, however, fails to point to any evidence that shows that the Board's decisions were made on the impermissible grounds of race. There is overwhelming evidence, on the other hand, to support the Board's business decision to retain Mr. Mahoney's and Mr. Urban's benefits. Mr. Mahoney was the Administrator in charge of running the Clinic during the financial crisis. Yet, Mr. Mahoney volunteered to resign. As Violet Cruz testified, the Board valued his services and opted to retain his benefits in order to keep him at the Clinic. Also, Mr. Urban assumed many of the responsibilities that would have been handled by Kert Reese, who involuntarily resigned as Chief Financial Officer and went on permanent return to the United States. The Board understood this undertaking and decided to retain Mr. Urban's benefits. The retention of Mr. Mahoney's and Mr. Urban's benefits, and the fact that they are non-Chamorros, do not in themselves in any way point to discrimination. What Plaintiff failed to demonstrate was that a *discriminatory* motive induced the Board's decisions.

Absent evidence of a discriminatory motive, the Court should not second-guess the Board's business decisions. "A business decision need not be good or even wise. It simply has to be nondiscriminatory." *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir. 1987). *See also Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989) (federal courts do not have a roving commission to review business judgments); *Ahmed v. American Red Cross*, 218 F.3d 932, 933 (8th Cir. 2000) (evidence amounting to nothing more than a critique of

the defendant's business judgment did not satisfy the plaintiff's burden of producing evidence of discrimination). In *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 728 (11th Cir. 1999), the Court determined that an employer's economic justifications for a reduction-in-force that led to the plaintiff's termination did not constitute a pretext for discrimination in which the employer reduced its workforce while at the same time issuing bonuses and raises to various executives and supervisors. "[T]he employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions." *Id.*

Plaintiff's suggestions that the Clinic should have cut Mr. Mahoney's and Mr. Urban's benefits, or that the Clinic should have tapped into its fixtures and real property assets to cover its financial deficit, or to do anything else besides reduce her benefits, segues directly into second-guessing the Clinic's business judgment. The uncontroverted evidence shows that the Clinic examined ways to cut costs, and whichever legitimate nondiscriminatory measures it chose were within the Board's business judgment purview. Plaintiff presents no evidence of discriminatory motive in the Clinic's decision to reclassify her position and not Mr. Mahoney's position or Mr. Urban's position. Without such evidence, the Court must allow the Clinic's business decisions and business discretion to stand.

(2) The Clinic's Treatment of IDEs.

Plaintiff claimed throughout trial that she has been treated differently from IDEs. The evidence demonstrated Plaintiff did not qualify as an IDE because she did not come from another Division within the SDA General Conference. However, the evidence also demonstrated that for over ten years prior to the financial crisis, Plaintiff was a contract employee who received benefits comparable to those provided to the IDEs. It was not until the financial crisis in 2003 that the Clinic reduced Plaintiff's benefits.

Furthermore, the Clinic exercised sound business judgment in retaining the IDEs' benefits during the financial crisis. The evidence demonstrated that IDEs, mainly consisting of healthcare providers of all races of all races,[1] were already being compensated at far below their market wage. Believing that it would lose its healthcare providers, its only source of revenue, if it reduced their benefits, the Clinic made a business decision to make financial cuts in other areas. The undisputed evidence also shows that the Clinic made financial decisions that affected IDEs, including amortizing their education loans, monitoring their leave, and eliminating paid paternity leave. Plaintiff provided no evidence that the Clinic's decisions with respect to IDEs were based on anything else besides business judgment.

(3)     The Clinic's Treatment of Locals and Non-locals.

Plaintiff presented a series of anecdotal evidence inferring a pattern and practice of discriminating against "locals."[2]     Such evidence must show that disparate treatment is Defendants' "standard operating procedure." *Intern. Bhd. of Teamsters v. United States,* 431 U.S. 324, 336 (1977); *Obrey v. Johnson,* 400 F.3d 691, 694 (9th Cir. 2005). Pattern or practice evidence may be through statistical evidence or strong anecdotal evidence. *Stender v. Lucky Stores, Inc.,* 57 FEP 1431, 1435 (N.D. Cal. 1991) (emphasis added). *See also Penk v. Oregon State Bd. of Higher Educ.,* 816 F.2d 458, 463 (9th Cir.1987) (anecdotal evidence insufficient to establish a pattern and practice of discrimination despite three individual violations).

Of course Plaintiff provided no statistics to sustain her claims that the Clinic engages in a pattern or practice of discrimination, or that discrimination is its "standard operating procedure." In fact, Defendants' statistical evidence demonstrates that the Clinic employs a wide range of

---

[1] The non-healthcare provider IDEs were Michael Mahoney and Jordan Urban, whose positions are discussed in the preceding section.
[2] Plaintiff fails to define which ethnicities are encompassed by the term "local." Defendant contends that without such definition, Plaintiff fails to prove that "local" is a protected category.

different races and ethnicities, the majority of which were Filipinos and Chamorros, and that except for doctors recruited primarily from the United States, Caucasians are the minority race of the workforce. Exs. D, E.

Plaintiff's pattern or practice evidence relied on the treatment of, in addition to herself, Frances Mantanona, Roger Natividad, and Violet Cruz, versus the treatment of Richard and Jolene Brecht. Neither Mrs. Mantanona nor Mr. Natividad attributed the adverse employment actions taken against them to discrimination based on their race. Mrs. Mantanona testified that because she failed to meet the expectations of her supervisor, he had it within his authority to modify her duties, salary and benefits. Mr. Natividad did not believe his IDE-comparable benefits were taken away because he was Filipino. Mr. Mahoney testified that Mr. Weidemann was on the verge of terminating Mr. Natividad because of his performance, but he was allowed to retain his job without the IDE-comparable benefits. Mrs. Mantanona confirmed Mr. Natividad's performance problems. In addition, neither Mrs. Mantanona or Mr. Natividad were similarly situated with Plaintiff, having been adversely affected years before Plaintiff's reclassification and by different supervisors.[3]

There is also no evidence of discrimination against Violet Cruz. Indeed, the allegation of discriminatory practice based on Violet Cruz's relationship with the Clinic may qualify as the second most tortured during the entire trial. The most tortured allegation of discrimination was the double-hearsay evidence regarding how - some 20 years ago - Robert Stahlnecker supposedly failed to achieve advancement within the SDA organization because of the perception by some

---

[3] "Anecdotes about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000). Anecdotal evidence of discrimination regarding persons with different supervisors than the plaintiff, who worked in different parts of the company, and whose adverse employment action was removed in time from the plaintiff's termination cannot be probative of whether age was a determinative factor in the plaintiff's adverse employment action. *Id.*

unidentified third-party, repeated by yet another, that he "sided too much with the 'locals.'" Would that be a local Chamorro, local Filipino, or a local person of some other non-white race? Just who is it that Mr. Stahlnecker "sided with" which supposedly resulted in his undoing? Even if it mattered, it is irrelevant because the double-hearsay "evidence" had no weight. What is known is that the Clinic never took into consideration Mrs. Cruz's marriage to a Chamorro in reviewing her retirement package. The record lacks any evidence of discrimination against Mrs. Mantanona, Mr. Natividad, or Mrs. Cruz to support Plaintiff's pattern or practice claim.[4]

Plaintiff further claims that "locals" are treated differently from "non-locals," as evident through the treatment of Mr. and Mrs. Brecht. However, the evidence demonstrates that Mr. Brecht was treated no differently from locals when suspicions arose regarding his stealing of drugs at the pharmacy. Just as Mrs. Mantanona and Mr. Natividad were allowed to retain their job in spite of performance problems, Mr. Brecht was similarly allowed to keep his job - at a lower pay and at a reclassified position - only if he paid his way to Hawaii to take drug rehabilitation courses. Mr. Brecht was also not similarly situated with Plaintiff, having had a different supervisor, being at a subordinate level than Plaintiff, and having been reclassified due to performance as opposed to financial reasons.

Mrs. Brecht is also not similarly situated with Plaintiff so as to be utilized for a pattern or practice comparison. Mrs. Brecht was a provider, and thus generated revenue. The Clinic had a business interest in offering her IDE benefits in order to retain a good dental hygienist, who could have returned to California or Colorado to earn two to three times the money she was

---

[4] It should be noted that while Plaintiff claims that discriminatory motives influenced the adverse employment actions involving Mrs. Mantanona, Mr. Natividad, and Mrs. Cruz, as Human Resources Director during their adverse employment actions, she was tasked to report and investigate these alleged instances of discriminatory conduct but failed to do so.

being paid at the Clinic. No evidence demonstrates that the Clinic offered Mrs. Brecht an IDE package because of race.

These incidents fail to provide strong or even sufficient proof of a standard operating procedure of discriminating against "locals." None of these collateral examples demonstrate any nexus between race and the adverse employment actions taken against the individuals. Accordingly, Plaintiff has not proved discrimination under a pattern or practice theory.

<blockquote>d.    <u>Plaintiff Fails to Demonstrate that the Financial Crisis Is Pretextual.</u></blockquote>

In order to prove that the Clinic's proffered nondiscriminatory reason for reclassifying Plaintiff is pretext, she must provide competent evidence that the reason was a "cover-up" for a discriminatory decision. *McDonnell Douglas*, 411 U.S. at 805. Pretext is established "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Burdine*, 450 U.S. at 256.

First, there is ample evidence in the record to support that financial reasons formed the primary basis behind Plaintiff's reclassification. Board members testified that Plaintiff earned more than one of the Clinic's healthcare providers. The Board determined that Plaintiff's salary should be comparable to the market wage, so that the Clinic would "get its money's worth." Board members also testified that Plaintiff's race played no part in its decision, and there is no evidence of any Board member possessing any discriminatory motive.

Second, the framework in which Plaintiff's reclassification was recommended and approved demonstrates its credibility and legitimacy. Plaintiff's reclassification formed one of nine immediate plans recommended by the Ad Hoc Committee to cut costs, and one of over forty measures to be implemented immediately, in the mid-term, and the long-term. Ex. AA. It also

constituted one of four cost-cutting measures which required approval by the Board. Ex. A. Plaintiff's position was not singled out and was not the focus of the Clinic's cost-savings measures.

To suggest that the Clinic invented its financial crisis to conceal its discrimination against Plaintiff is ludicrous. Such a suggestion necessarily infers that the Clinic's financial personnel manufactured its financial reports; that the Board ordered the Ad Hoc Committee, comprised of its top management, to conduct meetings and devise over forty immediate, mid-range, and long-term financial cost-savings measures to cover up discrimination against Plaintiff; that its auditors contrived their financial audit to show that the Clinic was suffering a loss in order to cover up its discrimination against Plaintiff; that the Clinic changed Mrs. Wresch's salaried position to hourly to cover up its discrimination against Plaintiff; that the Clinic forced the Nursing Manager to take on additional duties to cover up its discrimination against Plaintiff; that the Clinic forbid its employees from earning overtime to cover up its discrimination against Plaintiff; that the Clinic instituted a 72 hour pay period to cover up its discrimination against Plaintiff; and that it eliminated its advertising budget to cover up its discrimination against Plaintiff. The evidence demonstrated that the Clinic was compelled to reduce its expenses and has succeeded to the tune of $750,000 and a departure from operating in the red. The evidence of a financial crisis is credible and overwhelming. The evidence of discrimination is non-existent and illusory.

The Clinic did not contrive its financial situation or utilize it to conceal any discriminatory conduct. Plaintiff has not shown that the Clinic's financial reasons are pretext.

B.    PLAINTIFF HAS NOT PROVEN DISPARATE IMPACT.

During the closing arguments, Plaintiff announced for the first time that, in addition to proceeding under a disparate treatment analysis, she was pursuing a Title VII disparate impact

case. Plaintiff's Trial Brief acknowledges the existence of the disparate impact theory, but restricted her case to one "brought under the disparate treatment theory." Pl's Trial Brief at 4.

Disparate impact cases involve employment practices which are neutral on their face, but have a discriminatory effect without justification based on business necessity. *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990). As discussed previously, the disparate treatment model, in contrast, involves a discrete act of intentional discrimination against a single individual.

In order to establish a prima facie case of disparate impact, the plaintiff must: (1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation by way of statistical evidence. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992-995 (1988). The statistical disparities "must be sufficiently substantial that they raise such an inference of causation." *Id.* at 995.

Once the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant who may either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists. *Id.* at 996. The employer must also produce evidence that its disparate employment practices are based on legitimate business reasons. Thereafter, the plaintiff must show that other devices without a similarly undesirable discriminatory effect would also serve the employer's legitimate interests. *Id.* at 998.

Plaintiff has not identified which specific employment practice or selection criteria she is challenging, and has proffered no statistical evidence to support a disparate impact claim. Her failure to do so hampers this analysis because Defendants are uncertain how to defend a theory that was never pled or litigated.

Nevertheless, without conceding that Plaintiff has identified the IDE program as having a disparate impact on Chamorros or residents of Guam, Defendants herein discuss whether Plaintiff has proven that the program has any disparate impact.

The evidence showed that in order to qualify as an IDE, an employee must have come from a division other than the Southern Asia Pacific Division. Residents of Guam or other locations within the Southern Asia Pacific Division, whether Chamorros or of another ethnicity, do not qualify as an IDE in Guam by definition. However, Chamorros or residents from Guam are not precluded from becoming IDEs in other Divisions. For example, at least one other Chamorro, George Ulloa, is an IDE working in Oregon. Accordingly, the General Conference does not as a matter of policy prohibit Chamorros from becoming IDEs, but in order to qualify for an IDE package, a Chamorro resident of Guam must be relocated to another division.

The purpose of the program and the requirement that an IDE not be a resident within the jurisdiction in which she works is evident by the nature of the IDE benefits themselves. The IDE packages recognize the IDEs' sacrifice in relocating to another division by providing housing and a housing allowance, and by paying for the IDE to travel home once a year.

The evidence also demonstrated that the Clinic may employ Guam residents on contract and by contract, provide those persons benefits comparable to those given to IDEs. Dr. Flores, Plaintiff, Frances Mantanona, and Roger Natividad were all given benefits comparable to an IDE package. The Clinic paid the local contract employees housing allowances and tuition subsidies for their children, in addition to a number of other benefits.

IDE packages, moreover, are offered to a wide range of ethnicities. The evidence demonstrated that IDEs include Caucasians, Nigerians, Filipinos, Hawaiian, Koreans, Peruvians, Japanese, and Indonesians.

Because (1) IDEs are by definition not residents of Guam, (2) Chamorros have become IDEs in other General Conference divisions, (3) the Clinic has given residents of Guam IDE-comparable benefits, and (4) the Clinic's IDEs represent a range of nationalities, the evidence defeats Plaintiff's claim that the IDE program has a disparate impact on Chamorros or Guam residents.

Moreover, Plaintiff offered no statistical evidence to substantiate her claim that the IDE program has a discriminatory impact on residents of Guam, and therefore has not demonstrated causation. "Since [the Court's] focus is on the consequences of employer action, statistical evidence usually provides the only rational means of determining whether a facially neutral employment practice had a discriminatory impact." *Cotton v. City of Alameda*, 812 F.2d 1245, 1247 (9th Cir. 1987). Without such statistical evidence, Plaintiff has not proven her prima facie case. *Id.* at 1248 ("We cannot draw any conclusions from a statistical base of one."). The evidentiary record only permits the Court to conclude that the IDE program does not prohibit Chamorros from becoming IDEs in other Divisions, and that the Clinic does not restrict IDE or IDE-comparable benefits to persons other than Chamorros or residents of Guam.

Finally, should the Court find that Plaintiff has proven her prima facie case despite a lack of statistical evidence, she has not provided the Court with evidence of any other devices without a similarly undesirable discriminatory effect that also serve the employer's legitimate interests. *Watson*, 487 U.S. at 998.

Because she did not plead or prove a disparate impact case, Plaintiff cannot prevail and should not recover any damages based on disparate impact.

C.    PLAINTIFF IS NOT ENTITLED TO DAMAGES.

  1.    Plaintiff's Misconduct Limits an Award of Back Pay and Precludes Front
        Pay and Reinstatement.

Plaintiff's introduction of confidential personnel and privileged records at trial called into question whether Plaintiff would be subject to termination pursuant to the Workforce Confidentiality Agreement, Ex. BB, and whether such misconduct tolls back pay and prevents an award of front pay and reinstatement. Plaintiff did not disclose the confidential documents until thirty days prior to trial. Plaintiff's attorneys admitted on the record that the documents in question had come from Plaintiff directly - not from the Clinic's attorneys in discovery - and that the documents had never been produced to Defendants in discovery. By the time of trial, the Clinic Board had no knowledge of and, of course, had not yet convened to discuss Plaintiff's violation of the Workforce Confidentiality Agreement. However, Mrs. Mantanona testified that she intends to recommend Plaintiff's immediate termination as a result of the violations.

An employee who commits misconduct worthy of termination after an adverse employment action is subject to a tolling of back pay and restricted from an award of front pay and reinstatement. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352 (1995). The *McKennon* ruling allows an employer to take due account of its lawful prerogatives in the usual course of its business and the corresponding equities arising from the employee's wrongdoing.

During the trial, the Court distinguished *McKennon* on the grounds that the *McKennon* plaintiff was terminated, whereas here the Clinic has not yet terminated Plaintiff. On further examination, *McKennon* applies because the language of *McKennon* itself suggests that the Court examine whether "the employee in fact *would have been terminated*" if the employer had known of the misconduct. *Id.* at 362-63 (emphasis added). The "would have" standard signifies that *McKennon* does not rely upon or establish any distinction between affirmative conduct of

termination and pending discussions regarding termination. Here, the evidence (in particular testimony of the current Administrator, Mrs. Mantanona) demonstrated that Plaintiff would have been terminated if the Clinic had become aware of her misconduct, and initiated the process of terminating her once it became aware of it. Under the "would have" standard announced in *McKennon*, the Clinic has satisfied its burden of showing that Plaintiff would have been terminated for disclosing confidential personnel records.

At least one case applies *McKennon* in the absence of termination by the employer. In *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1234 (4th Cir. 1995), the employer learned during discovery that the employee falsified information on her resume. The Court did not find the employer's delay in firing her to be fatal. *Id.* at 1240. "[T]he company faced a difficult situation in which the availability of this defense was not established, and it acted in an understandably conservative manner, in fear of the additional liability for discriminatory retaliation that might attach to its conduct." *Id.* On the other hand, "an employer's decision *not* to terminate a Title VII plaintiff would be dispositive on this issue." *Id.* (emphasis added). Here, the Clinic did not decide *not* to terminate Plaintiff; it simply had not yet convened to consider the issue by the time of trial. The evidence also shows that the Clinic considers the violation of the Workforce Confidentiality Agreement to be a serious violation, and that it intends to initiate termination proceedings. Moreover, as in *Russell*, the Clinic stands at risk of being accused of retaliation if it immediately terminated Plaintiff during the pending litigation. The Clinic could not be expected to expose itself to the risk of a retaliation claim in order to preserve its rights under *McKennon*, and should not be foreclosed from availing itself of the *McKennon* remedy limitations.

Finally, in line with the principles outlined in *McKennon*, applying *McKennon* here allows the Clinic to pursue its lawful prerogatives in the usual course of its business and the

corresponding equities resulting from Plaintiff's misconduct. Applying *McKennon*, and particularly prohibiting reinstatement, allows the Clinic to enforce the Workforce Confidentiality Agreement and to ensure the deterrence of further unauthorized disclosures of its confidential information by Plaintiff or by other employees engaging in similar misconduct.

### 2. An Award of Back Pay Would be Speculative.

Plaintiff's salary remained unchanged after her reclassification, and thus she should not be awarded any back pay based on a salary differential. Plaintiff claims that she would have received incremental salary raises, but fails to establish the amount and the timing of those increments, signifying that a back pay award encompassing a raise would be speculative.

Plaintiff also failed to demonstrate the monetary value of her reduced benefit package, signifying that any award of back pay would also be speculative. For example, Plaintiff's reclassification eliminated the tuition benefit for her dependents. However, her dependents have completed their schooling, and thus, she would never have received a tuition benefit in the first place. In addition, the benefits of continuing education and subscriptions to trade journals are not personal benefits for Plaintiff, in that she does not have the discretion to keep the money paid for the education and the subscriptions for herself. She would not be entitled to back pay for these expenses that benefit the Clinic as opposed to her personally.

### 3. Plaintiff Failed to Mitigate Damages and Is Therefore Not Entitled to Back Pay, Front Pay, or Reinstatement.

Plaintiff failed to meet her obligation to mitigate her damages. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 236 (1982). She failed to accept the management position at the Wellness Center, which precludes any award of back pay and defeats Title VII's goal of making her whole. *Id.* at 231, 239 (employee forfeits right to back pay if he refuses a job substantially equivalent to the one he was denied). Her obligation to minimize damages required her to accept the Wellness

Center position, even if it did not reinstate the same benefits she received as the HR Director. *Id.* at 234.[5]

She also failed to mitigate her damages by failing to attend school, thereby abandoning her job. *Ford* recognizes that Title VII's goal of making a plaintiff whole occurs through cooperation and voluntary compliance. *Id.* at 228. The Clinic cooperated by paying for her college education in HR along with a full management salary. Plaintiff, however, failed to cooperate, and the Clinic essentially paid for someone who never went to work, a result that is not required under Title VII. Just as in *Ford*, in which the Court found that offering a Title VII claimant the job she sought gives the employer a strong incentive to hire her, here, the Clinic had an incentive to educate Plaintiff and improve her skills for her return to the workplace. *Id.* at 228-29. Plaintiff denied herself a chance to be whole and denied the Clinic an educated employee. She abandoned her job and is not entitled to recover under Title VII.

Plaintiff's rejection of the Wellness Center position and her failure to attend school furthermore bar an award of reinstatement and front pay. *Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989) (employees cannot avoid their obligation to mitigate damages by holding out for a court-ordered reinstatement).

> 4.  Plaintiff Is Not Entitled to Compensatory Damages for Emotional Distress.
>
>     a.  The Court Should Afford No Weight to the Testimony of Dr. Pamina Hofer.

The late disclosure of Dr. Hofer as an expert witness prejudiced Defendants, who were unable to depose Dr. Hofer or to procure their own expert to rebut Dr. Hofer's opinions and to

---

[5] The *Ford* court explained that retroactive seniority need not be reinstated if it effectuates a disfavorable result for innocent third parties employees who have not filed Title VII cases. *Id.* at 233. In this case, the Clinic reclassified both Plaintiff and the Administrative Secretary. The Clinic has not reinstated the Administrative Secretary position to be salaried. It would have been unfair to require Defendants to offer Plaintiff her original benefits while continuing to deny salaried benefits to the Administrative Secretary.

assist Defendants in preparing for Dr. Hofer's testimony. Accordingly, the Court should not rely upon Dr. Hofer's testimony in assessing damages based on emotional distress. Fed. R. Civ. P. 37(c)(1);[6] *Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 572 (8th Cir. 1989) (excluding testimony of expert regarding plaintiff's emotional distress where plaintiff failed to identify the witness and make her available for deposition).

### b.     Plaintiff Failed to Mitigate Her Emotional Distress.

Plaintiff is not entitled to recover compensatory damages. First, Plaintiff failed to mitigate, and instead exacerbated, her emotional distress damages by refusing the management position at the Clinic's Wellness Center and by discontinuing her education. 42 U.S.C. § 2000e-5(g); *Ford*, 458 U.S. at 236. Even if she did not return as HR Director, the management position at the Wellness Center would have preoccupied Plaintiff's mind and would have encouraged her to enjoy life more. Pursuing the fully paid education would have also alleviated Plaintiff's stresses, and would have provided opportunities to alleviate social isolation.

Second, the evidence also demonstrated that causes other than the reclassification attributed to Plaintiff's emotional condition, such as ongoing distress related to the 2001 shooting at the Clinic and her undergoing menopause. Plaintiff claims to have suffered distress because of the litigation, however, she cannot recover for emotional distress caused by the litigation. *Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 736 (D.N.J. 1998).

Finally, Plaintiff testified that her distress has not disabled her from continuing her role as a deaconess, an important position which requires her interaction with members of her church.

By fully paying her a management salary plus benefits since the inception of the litigation, and offering her management and educational opportunities, the Clinic afforded

---

[6] See Defendants' Motion in Limine to Exclude Evidence Relating to Plaintiff's Psychological Treatment, filed November 29, 2005, for a discussion on excluding such evidence pursuant to Rule 37.

Plaintiff many opportunities to lead a stress-free life. She failed to pursue those opportunities and to mitigate her emotional distress. She is therefore not entitled to compensatory damages.

### 5. Plaintiff is Not Entitled to Punitive Damages.

Plaintiff cannot recover punitive damages unless Clinic executed malice or reckless indifference towards her rights. 42 U.S.C. § 1981a(b)(1). Punitive damages are available only if the Court finds that the Clinic has intentionally discriminated against Plaintiff, and are not available on her disparate impact theory. 42 U.S.C. § 1981(a)(1); *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999). Also, an employer may not be held vicariously liable for discriminatory employment decisions of managerial agents where the decisions are contrary to the employer's good faith efforts to comply with Title VII. 527 U.S. at 545. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001) (examining conduct of managerial agent).

The Clinic established an anti-discrimination and harassment policy requiring employees to immediately report discrimination to the HR Director or the Clinic Administrator. Ex. R. In spite of her position as HR Director and in violation of the policy, Plaintiff never reported any instance of discrimination that she now claims occurred with respect to herself, Frances Mantanona, Roger Natividad, or Violet Cruz.

With respect to herself, Plaintiff presented no evidence to demonstrate that the Clinic acted maliciously or with reckless indifference to her rights. Plaintiff never reported any discrimination to herself until filing her charges with the EEOC and with the Court. Her failure to report any discrimination precluded Defendant from any opportunity to act in any way upon her accusations, let alone in a malicious or reckless manner.

Accordingly, Plaintiff is not entitled to punitive damages.

6.    Plaintiff's Compensatory and Punitive Damages Are Capped at $100,000.

Title VII establishes a cap of $100,000 on both compensatory and punitive damages for employers with 101 to 200 employees, and $200,000 for employees with 201 to 500 employees. 42 U.S.C. § 1981a(b)(3). Plaintiff seeks a judgment against the Mission and the application of the $200,000 cap on damages. However, in order for Plaintiff to hold the Mission liable and to avail herself of the $200,000 cap, she must prove that the Mission is her "employer." Plaintiff must make this showing of imputed liability to the Mission because the evidence demonstrated that Plaintiff's Employment Agreement is with the Clinic, and that the Employment Agreement nowhere mentions the Mission. Ex. B. The evidence also demonstrated that the Clinic is a subsidiary of, but financially independent from, the Mission.

In a Title VII case, liability is only imputed to a parent corporation if the parent participated in or influenced the employment policies of the subsidiary, or if it undercapitalized the subsidiary in a way that defeated potential recovery by a Title VII plaintiff. *Watson v. Gulf and W. Indus.,* 650 F.2d 990, 993 (9th Cir. 1981). Determining that a parent and subsidiary are a single employer requires a finding of "special circumstances." *Id.*

There is no evidence in the record to show that Mission influenced the employment policies of the Clinic or had any financial relationship with the Clinic. The evidence demonstrated that the Mission and the Clinic operate separately and independently from each other. The Clinic Board and its administrators determined the Clinic's personnel policies and make personnel and financial decisions. At no time did the Mission approve or disapprove of the Clinic's decisions to reclassify Plaintiff, or even voice any opinion regarding the Clinic's financial crisis and the measures developed to deal with the financial crisis. Nor does the Mission assume any responsibility for the Clinic's finances. Any "oversight" conducted by the Mission would only be characteristic of a parent-subsidiary relationship and does not establish

that the Mission and the Clinic are a single employer. *See Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 982 (4th Cir.1987).

Moreover, the Mission-Clinic structure does not render total relief unavailable to Plaintiff. Should Plaintiff prevail, the Clinic has the financial capability, and more importantly, the financial responsibility, to handle any award of damages, back pay and front pay.

For these reasons, Plaintiff's only employer is the Clinic, signifying the applicability of the $100,000 cap on compensatory and punitive damages combined.

       7.    Attorneys' Fees

Defendants dispute Plaintiff's entitlement to attorneys' fees, and request that attorneys' fees be awarded in favor of Defendants. Per agreement between the parties and the Court, Defendants defer its discussion on attorneys' fees until after the Court reaches a decision on liability.

## IV.   **CONCLUSION**

Plaintiff has failed to present any persuasive evidence of discrimination. Judgment should be awarded in favor of Defendants.

DATED: Hagåtña, Guam, January 20, 2006.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Attorneys for Defendants
Guam Seventh-Day Adventist Clinic,
Guam-Micronesia Mission, and
Michael Mahoney

# DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States,

that on January 20, 2006, I will cause to be served, via hand delivery, a true and correct copy of

**DEFENDANTS' POST-TRIAL BRIEF** upon Plaintiff's Counsel of record as follows:

> Peter J. Sablan, Esq.
> Lujan, Aguigui & Perez, LLP
> Suite 301, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910

Executed this 20th day of January 2006 at Hagåtña, Guam.

DAVID LEDGER