UNITED STATES DISTRICT COURT

DISTRICT OF GUAM



DISTRICT COURT OF GUAM

MAR - 7 2006

MARY L.M. MORAN
CLERK OF COURT

JULIA BORJA EMMANUEL, )
                      )
          Plaintiff,  )
                      )
     v.               )
                      )     No. C-03-00030
GUAM SEVENTH-DAY ADVENTIST )
CLINIC, GUAM-MICRONESIA    )
MISSION, MICHAEL MAHONEY, and )
DOES 1 through 10, ·       )
                      )     **FINDINGS OF FACT AND**
          Defendants. )     **CONCLUSIONS OF LAW**
_____)

This matter came on for a bench trial which was held on

December 6, 2005 through December 13, 2005.  Throughout these

proceedings, Peter C. Perez and Peter J. Sablan appeared on

behalf of Plaintiff Julia Borja Emmanuel.  David Ledger and

Elyze McDonald appeared for Defendants Guam Seventh-day

Adventist Clinic and Guam-Micronesia Mission.  This matter is an

action under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e et seq. against Defendants Guam Seventh-day

Adventist Clinic and Guam-Micronesia Mission.  Defendant Michael

Mahoney was dismissed from this matter July 22, 2004 and Does 1

through 10 were dismissed on November 29, 2005.  In an Order

dated July 5, 2005, the Court found that Plaintiff had waived

her right to a jury trial and Defendants' motion to strike

Plaintiff's demand for a jury was granted.

This Order sets forth the Final Findings of Fact and

Conclusions of Law of this Court.

1

# FINDINGS OF FACT

A.   Plaintiff Julia Borja Emmanuel

1.   Plaintiff Julia Borja Emmanuel (Plaintiff) is a citizen of the United States and a resident of Guam.

2.   Plaintiff is Chamorro, the ethnicity of the indigenous people of Guam, and she is female.

3.   Plaintiff was employed by Defendant Guam Seventh-day Adventist Clinic (Clinic) in December 1990 and served as its Human Resources (HR) Director from September 1, 1992 until September 1, 2003.

B.   Guam Seventh-day Adventist Clinic and Guam-Micronesia Mission

1.   The Guam Seventh-day Adventist Clinic (Clinic) and the Guam-Micronesia Mission (Mission) are non-profit organizations part of the Seventh-day Adventist Church (SDA).

2.   The Defendant Clinic is one of a number of activities under the supervision of the Defendant Mission.  The activities supervised by the Mission include churches, schools, and medical clinics in the several islands within the territory of the Mission.  At all periods pertinent to this case, Pastor Remenster Jano, a United States citizen of Ponapean origin and ethnicity, served as the Mission President.

3.   The Seventh-day Adventist General Conference is the governing body of the SDA.

4.   The SDA is divided into thirteen regional Divisions for administrative purposes.  Each Division is further subdivided

2

1 into several Missions. The Guam-Micronesia Mission is within
2 the Southern Asian-Pacific Division of the SDA.

3 5. The governing body of the Clinic is a Board of Directors
4 (Board) appointed by the Mission.

5 6. Day-by-day supervision of the Clinic is run by an
6 Administrative Council (Ad Council) of Clinic employees selected
7 by the Board. The Clinic Administrator works under the Ad
8 Council.

9 7. The Clinic employs approximately 200 employees.

10 8. The Clinic employs Interdivision Employees (IDEs), contract
11 employees, and local resident hires.

12 9. At the Clinic, IDEs are generally healthcare professionals,
13 primarily physicians and dentists, who maintain their permanent
14 residency in a Division other than the Southern Asia-Pacific
15 Division and travel to and reside temporarily on Guam to work
16 for the Clinic.

17 10. The Clinic, as a SDA organization, requires that its
18 healthcare providers, regardless of whether they are IDEs or
19 hired locally, belong to the Seventh-day Adventist faith. The
20 IDEs are "called" to their work at the Clinic by the General
21 Conference of the SDA, and their service is regarded to be akin
22 to missionary service.

23 11. The law of Guam requires that medical healthcare providers
24 practicing in Guam must be licensed in the United States.

25 12. The Clinic recruits a majority of its healthcare providers
26 from other SDA Divisions, the Northern American Division in

27

28                                    3

1  particular, as it is difficult to find persons of the Seventh-
2  day Adventist faith with the requisite healthcare qualifications
3  and licensing on Guam or in the Southern Asia-Pacific Division.
4  13.  Healthcare providers working at the Clinic, whether IDEs or
5  not, generally make less than they would be paid in the United
6  States.
7  14.  The Clinic offers an IDE benefits package that includes a
8  housing allowance, a tax subsidy, vacation time with paid off-
9  island travel, and tuition benefits for dependents.  The package
10  is designed to assist IDEs while they are displaced from their
11  homes in the United States or country of origin, and to help
12  make up the pay disparity which accompanies their work at the
13  Clinic.
14  15.  Local resident hires, as opposed to IDEs, are employees
15  hired from the Guam community at large.  Local resident hires
16  receive a standard benefit package which includes, among other
17  items, heath and dental insurance and a life insurance option.
18  16.  Contract employees of the Clinic may have employment
19  contracts which include benefits in addition to the standard
20  local hire benefit package.  These contract benefits may be
21  comparable to the IDE benefit package.  Contract employees
22  negotiate their contracts with the Clinic on a case-by-case
23  basis.  For example, the current Clinic Administrator, Frances
24  Mantanona, although a resident of Guam and not an IDE, has a
25  negotiated contract with the Clinic which includes IDE-type
26  benefits.
27
28                                4

1   17. At the Clinic, in her role as HR Director, Plaintiff was a
2   locally hired contract employee. Her benefits before the 2003
3   reclassification of the HR Director position included car
4   depreciation assistance, car insurance, a utility allowance,
5   tuition subsidies for her children's education, vacation time,
6   subscriptions to professional journals, continuing education
7   with expenses covered for tuition and travel to attend a
8   continuing education course, and a homeowner's allowance. These
9   benefits were comparable to IDE benefits.

10  18. The Clinic and the Mission generally commended Plaintiff
11  for her work performance and awarded her regular incremental
12  raises. See, e.g., Plaintiff's Exhibits (Pl. Exhs.) 7, 14-17,
13  20, 62. She was appointed to the Administrative Council of the
14  Clinic. She was entrusted with responsibilities, such as
15  negotiating insurance contracts. She was also an invitee on the
16  Mission's Executive Committee. She was voted to act as the
17  Mission's Children's Minister and to be a spiritual leader for
18  employee retreats.

19  19. Michael Mahoney became the Clinic's Administrator in mid-
20  2001, and served as Administrator during the time period in 2003
21  when the activities which gave rise to this lawsuit occurred.
22  20. At the time Mahoney became Administrator, the ethnic
23  breakdown of the Clinic's non-healthcare provider staff and
24  management was: 51% Filipinos, 20% Chamorros, 14% Caucasians,
25  6% Pacific Islanders, 3% Caucasian-Chamorros, 2% African-
26  American, 2% other, 1% mixed and 1% Chinese. Defendants'

27

28                                      5

1  Exhibit (Def. Exh.) D. Among healthcare providers, the ethnic
2  breakdown was 25 Caucasians, 1 Nigerian, 2 Filipinos, 2
3  Hawaiians, 5 Koreans, 1 Peruvian, 2 Japanese, and 2 Indonesians.
4  Def. Exh. D.

5  21. In mid-2004 when Mahoney ceased being Administrator, and
6  after Plaintiff brought this lawsuit, the ethnic breakdown of
7  the Clinic's non-healthcare provider staff and management was:
8  51% Filipinos, 22% Chamorros, 15% Caucasians, 6% Pacific
9  Islanders, 1% African-American, 2% other, 2% mixed and 1%
10  Chinese. Def. Exh. E. Among healthcare providers the ethnic
11  breakdown was: 22 Caucasians, 1 Nigerian, 3 Filipinos, 1
12  Hawaiian, 5 Koreans, 1 Peruvian, 2 Japanese, 2 Indonesians, and
13  1 female Chamorro. Def. Exh. E.

14  C. The Board of Director's Decision Regarding Plaintiff's
15     Employment Position and Benefits

16  1. Over the years the Clinic had been generally fiscally sound
17  but began to suffer financial losses as a result of the lasting
18  effects of the bankruptcy of a local insurance company, GMHP, to
19  which a large number of patients seeking treatment at the Clinic
20  belonged. The Clinic continued treating patients in spite of
21  the lack of insurance coverage by GMHP. Trial testimony
22  established that eventually, GMHP paid about thirty to thirty
23  five cents on the dollar on the $1,000,000-plus amount owed to
24  the Clinic. Testimony also established that the Clinic was
25  recovering from a loss of business resulting from a shooting
26  incident at the Clinic in 2001 where one person was killed.

27

28                                    6

1  2. Financial statements introduced at trial confirmed that the
2  Clinic was operating at a loss in 2002 and 2003. The evidence
3  established that the loss for 2002 was approximately $800,000
4  and that the projected loss for 2003 as of mid-2003 was believed
5  to be over $250,000.

6  3. Mahoney, the Clinic Administrator during this time,
7  testified that the Clinic's financial condition made it
8  difficult to upgrade equipment, invest in infrastructure, and
9  recruit healthcare providers. Pastor Jano testified that at one
10 point in time, Clinic officials went to the Mission asking for
11 prayers to help the Clinic meet payroll. Violet Cruz, a Clinic
12 Board Member, also testified that the Clinic was having
13 financial difficulties.

14 4. At a meeting of the Clinic Board in the spring of 2003, the
15 Board heard reports as to the financial condition of the Clinic
16 and voted to establish an Ad Hoc Committee on Savings and
17 Efficiency, to consider any actions the Board should take to
18 respond to the financial crisis. The Board asked the Ad Hoc
19 Committee to develop and propose cost-cutting measures. The Ad
20 Hoc Committee was comprised of:

21 • Administrator Michael Mahoney
22 • Chief Financial Officer (CFO) Kerstan Reese
23 • Jordan Urban, the Clinic's Chief Accountant
24 • Dr. Bevan Geslani, the Clinic's Medical Director
25 • Reggie Leach, a Board member
26 • Michael Robinson, another Clinic employee
27
28                                    7

5.    Dr. Geslani acted as Chairman of the Ad Hoc Committee.

6.    On May 28, 2003, based on a list of options prepared by Dr. Geslani, the Ad Hoc Committee devised a number of immediate measures to cut costs at the Clinic.  Pl. Exh. 46.

7.    Those immediate measures included:

- eliminating some of the benefits of the HR Director position and basing the salary on the market wage for such a position in Guam
- replacing the nursing manager position with a supervisory position with part-time nursing duties
- eliminating the customer service position
- instituting a hiring freeze
- re-negotiating janitorial contract services
- cross-training employees to become versatile in several positions
- eliminating overtime and temporary work
- eliminating paid paternity leave
- implementing a 72-hour pay period.

8.    The Ad Hoc Committee also recommended a number of intermediate/mid-range and long-term strategic cost-savings measures for the future.  Pl. Exh. 46.  The intermediate/mid-range plans included:

- studying the IDE status for a dental hygienist
- studying the IDE status for an administrative position
- reviewing the number of IDE staff of the Wellness Center
- reviewing the staffing level of the dental clinic

8

1   • reviewing the advertising budget

2   • eliminating floating holidays

3   • lumping sick time and other leave time

4   • shifting family practice physicians to more outpatient

5     clinic hours from hospital duties

6   • re-evaluating the need to have available guest apartments

7   • restudying the practice of comp time

8   • reviewing subsidy amounts

9   • studying the costs of mission trips for providers

10  9.   Finally, the Ad Hoc Committee recommended a long-term

11  strategic plan.  Pl. Exh. 46.  The long-term plan included:

12  • reviewing the provider loan amortization program for new

13    physicians/providers

14  • implementing policy of step-wise increase in percentage of

15    base salary for new physicians out of residency

16  • capping continuing education funds

17  • working on pharmacy software and inventory system

18  • working on staff level for purchasing and better inventory

19  • obtaining bulk discounts for medical and office supplies

20  • studying areas of redundancy in space needs

21  • reviewing requests of providers and scheduling of leaves

22    and vacations to avoid times of low provider presence in

23    the Clinic

24  • tracking new patients to see how they decided to come to

25    the Clinic

26  • developing a better way to scan records to save time

27

28                              9

1  • conducting a phone line audit and looking at alternatives
2       to phone cost
3  10.  The Ad Hoc Committee then presented its recommendations to
4  the Ad Council of the Clinic.
5  11.  On June 3, 2003, the Ad Council adopted a number of the Ad
6  Hoc Committee's immediate recommendations.  For example,
7  consensus approval was reached to eliminate paid paternity
8  leave, to eliminate funding of support staff during mission
9  trips, to work on negotiating better pricing for pharmaceutical
10  medications and other supplies, and to implement use of volume
11  accounts.  The Ad Council forwarded the other recommendations of
12  the Ad Hoc Committee for action by the Clinic Board.  Pl. Exh.
13  47.
14  12.  The following Ad Council members were present at the June
15  3, 2003 meeting:
16  • Plaintiff
17  • CFO Kerstan Reese
18  • Jolene Brecht
19  • Michael Robinson
20  • Dr. Bevan Geslani
21  • Bob Wresch.
22  13.  On July 10, 2003, the Clinic Board met to discuss the
23  financial situation at the Clinic and to consider the Ad Hoc
24  Committee's recommendations on cost-saving measures.  The voting
25  members of the Board who were present at the meeting were:
26  • Pastor Jano, a Ponapean
27
28                                    10

- Violet Cruz, a Caucasian married to a Chamorro
- Reggie Leach
- Administrator Michael Mahoney, a Caucasian
- CFO Kerstan Reese, an African-American
- Dr. Bevan Geslani, a Filipino
- Dr. Richard Ludders

14. After voting to accept CFO Reese's financial report detailing the financial troubles at the Clinic, the Board discussed possible cost-saving changes at the Clinic and held votes on a number of the cost-saving measures proposed by the Ad Hoc Committee.

15. Among the cost-saving measures voted on, the Board voted to reclassify the HR Director position to that of HR Manager. The vote changed the reimbursement of the position from that of a salaried position to that of an hourly position. The exact wage for the HR Manager position was to be established by the Clinic's Administrator and Medical Director. All benefits for the newly classified position would be equal to that of the hourly positions at the Clinic and any additional benefits were eliminated.

16. The Board's reclassification decision meant that Plaintiff's total compensation would be reduced and that Plaintiff would receive the standard local resident hire benefit package as opposed to the IDE-comparable benefits she had previously received.

17. Other cost-saving measures adopted by the Board at the July

11

1   10, 2003 meeting included review of the present janitorial
2   services contract, reclassifying the Administrative Secretary to
3   an hourly position, and not filling the position of the CFO,
4   which was about to become vacant on the announced resignation of
5   the incumbent CFO Kerstan Reese. Pl. Exh. 56. The Board also
6   voted to retain the services of Mahoney as Administrator and
7   Urban as Chief Accountant. Pl. Exh. 56. Mahoney did not
8   participate in the vote regarding his position, and had offered
9   to resign so that the Clinic could hire an Administrator with
10  lower salary expectations.

11  18. All of the Board members present took part in the vote on
12  the decision to reclassify the HR Director position except for
13  Pastor Jano, who was acting as the Board Chairman and was not
14  required to vote.

15  19. Trial testimony established that all of the six Board
16  members who took part in the vote on the HR Director position
17  voted in favor of reclassifying the position, with the possible
18  exception of CFO Reese.

19  20. There was a dispute at trial over how Reese voted. Pastor
20  Jano, Cruz, and Mahoney testified that the vote in favor of
21  reclassifying the HR Director position was unanimous. Reese did
22  not appear at trial, but stated in his deposition, which was
23  entered into the record at trial, that he believed he had not
24  voted in favor of reclassifying the HR Director position. The
25  minutes of the July 10, 2003 meeting do not reflect that anyone
26  voted in opposition to reclassifying the HR Director position.

27

28                                  12

Pl. Exh. 56

D. Plaintiff's Lawsuit

1. Plaintiff filed this Title VII action on August 7, 2003, and alleged that the Clinic discriminated against her on the basis of her race, ethnic origin and gender.

2. At closing arguments, Plaintiff conceded that she had not proven a case of gender discrimination.

3. After Plaintiff filed her lawsuit, Clinic management reviewed alternatives to Plaintiff continuing in her position as HR Manager. Among the possibilities discussed with Plaintiff, was an offer that she would be placed on administrative leave with full pay, in exchange for Plaintiff's agreement to attend classes at the University of Guam. Plaintiff accepted this offer.

E. Trial Testimony - Non-Board Members

In the following section, the Court describes the testimony of the witnesses at trial, except for those witnesses who were on the Clinic's Board and present at the July 10, 2003 Board meeting, which will be described later in this Order.

1. Robert Stahlnecker

a. Stahlnecker is a white male and member of the SDA Church. He was called by Plaintiff as a witness to support her contention that there exists a pattern or practice of discrimination by the Clinic.

b. Stahlnecker testified that some 20 years ago his application to serve as pastor, at the Church in Guam, was

13

1  turned down. The witness stated that at the time of that

2  decision, a person, whose identity he cannot recall, told him

3  that he was perceived as someone who sided too much with the

4  locals.

5  2.  Frances Mantanona

6      a.  Mantanona was called by Plaintiff, in her case in

7  chief, as a witness to support the existence of a pattern or

8  practice of discrimination by the Clinic. As the current

9  Administrator at the Clinic, she was also called as a witness by

10 the Defense.

11     b.  Mantanona, a Chamorro, was employed in several

12 administrative positions at the Clinic from 1990 until 2000,

13 ending as the assistant to the Administrator. In those

14 positions, Mantanona held an employment contract providing

15 benefits similar to an IDE package. In 1999, Mantanona was said

16 to be unable to meet her performance expectations by the then-

17 Administrator, Don Weidemann. As a result, the Clinic Board

18 reduced Mantanona's duties, and modified her benefit package to

19 be similar to that of other local hire salaried employees. In

20 February 2000 she resigned from the Clinic, and sought

21 employment at another healthcare clinic on Guam. Mantanona

22 testified that the Clinic did not reduce her benefits because

23 she was Chamorro, and that she has never filed a discrimination

24 claim against the Clinic.

25     c.  Mantanona was rehired by the Clinic Board in August

26 2004 as Clinic Administrator succeeding Michael Mahoney.

27

28                              14

d. Mantanona, as Administrator at the Clinic since 2004, testified that there is no general prohibition against providing Chamorros with IDE or IDE-comparable benefits because they are Chamorro.

e. As the current Administrator, Mantanona testified as to the implementation and continuing effects of the immediate, mid-range and long-term cost-saving measures adopted by the Clinic's Ad Council and Board in July 2003 and thereafter. The Clinic has instituted a number of the intermediate-range measures proposed by the Ad Hoc Committee to effect cost savings, including increasing the workload of the dental hygienist, decreasing the number of staff at the Wellness Center, eliminating the advertising budget, lumping sick leave and regular leave into one category of leave time, and discontinuing the allowance of compensatory time. The Clinic has also instituted many of the Ad Hoc Committee's proposed long-term measures, including amortization of providers' education loans, monitoring providers' leave requests to ensure full-level staffing at all times, more efficient scanning of its medical records, and eliminating direct phone lines. Mantanona testified that implementation of the cost-savings measures has effectively improved the financial condition of the Clinic. Mantanona testified that as a result of implementation, the Clinic was able to eliminate an operational loss for the full year of 2003 as well as for the full year in 2004.

f. Plaintiff maintained at trial that Mantanona had been

15

given the Administrator position by the Clinic in 2004, after
this lawsuit was filed, because she was a female Chamorro and
hiring her would present the Clinic in a better light at trial.
In her post trial arguments Plaintiff described this
circumstance as an attempt to conceal past practices of
discrimination. Plaintiff's argument raises a question of fact.
What was the purpose of the Clinic Board when it hired Mantanona
in 2004? The trial evidence shows a regular application and
hiring process and that Mantanona's qualifications are obvious
and impressive. Plaintiff presents no evidence to support its
accusation. The Court finds that Plaintiff's contention is not
true - Mantanona was hired to serve as the Administrator of the
Clinic, not as a litigation ploy.

g. Plaintiff makes a parallel argument based on the fact
of Mantanona's status as Clinic Administrator - that the Court
should reject her testimony as it is biased. This is, again, a
question of fact. The Court heard the testimony and observed
the demeanor of the witness. Mantanona was a central witness in
the trial - called as a witness by both the Plaintiff and the
Defendants. She was able to recall the relevant historical
events and was fully responsive, forthright, and candid in her
testimony. Beyond the accusation of bias, Plaintiff offers
nothing to dispute or impeach the testimony presented. The
Court rejects the argument of Plaintiff and accepts the
testimony of Frances Mantanona as an honest, wholly credible
account of her knowledge of the events at issue in this case.

16

3.  Dr. Pamina Hofer

     a.   Dr. Hofer testified that she treated Plaintiff for
emotional distress during 2004 and 2005. Dr. Hofer met with
Plaintiff approximately eight to ten times during this period
and testified that Plaintiff exhibited symptoms of stress
including dizzyness, sudden fear without reason, abnormal sleep
patterns and difficulty sleeping, lack of appetite, and lack of
energy.

4.  Roger Natividad

     a.   Natividad, like Mantanona, was called by Plaintiff in
support of her contention of the existence of a pattern or
practice of discrimination by the Clinic.

     b.   Natividad, a Filipino, acted as the Clinic's
Maintenance Director. Natividad was reclassified to Maintenance
Supervisor in response to complaints by then-Administrator
Weidemann of his smoking at the non-smoking clinic facility, and
his poor performance on certain jobs. Weidemann sought to
terminate Natividad, but was convinced by the then-Associate
Administrator Mahoney to instead reclassify Natividad and reduce
his benefits. While the reclassification eliminated certain
benefits, it maintained his wage at the same level as his annual
salary earned as the Maintenance Director. Prior to his
reclassification, Natividad received IDE-comparable benefits
including the full payment of his daughter's college tuition at
Loma Linda University. Natividad has since retired from working
at the Clinic, and current Administrator Mantanona testified

17

1 that although his poor performance, as well as sleeping on the
2 job, became issues towards the end of his employment, the Clinic
3 allowed Natividad to retire with full retirement benefits.

4 c. Natividad testified that he did not consider the
5 conduct of the Board, as to his employment, was taken because of
6 his ethnic origin.

7 5. Richard Brecht

8 a. Richard Brecht, a Caucasian, was employed by the
9 Clinic as a local hire maintenance technician. The evidence
10 established that after it was found that Brecht had taken drugs
11 from the Clinic without authorization, as disciplinary measures,
12 the Clinic demoted and reclassified him, required him to attend
13 rehabilitation treatment, pay restitution, and reduced his pay.

14 b. Plaintiff argued that the relevance of this testimony
15 was to show an atmosphere at the Clinic which treats Caucasians
16 more favorably, on the asserted premise that Richard Brecht was
17 "let off easy" because of his race, Caucasian. There was no
18 evidence of what the Clinic had done by way of discipline
19 related to any other employee who had engaged in similar
20 conduct.

21 6. Jolene Brecht

22 a. Jolene Brecht, married to Richard Brecht, is a
23 registered and licensed dental hygienist who works for the
24 Clinic. She is a Caucasian who relocated to Guam from the
25 United States, and was offered IDE status a few years after she
26 began working at the Clinic. Brecht declined initial offers to

27

28                                  18

become an IDE, but ultimately accepted based on the Clinic's need for a permanent dental hygienist. Brecht testified that her salary at the Clinic amounts to less than what she would earn in California and Colorado, where she is also licensed to practice. Brecht further testified that as a healthcare provider at the Clinic she helps bring in profits for the Clinic, and that her IDE benefits help make up the pay disparity from her salary at the Clinic and what she would receive as a healthcare provider in the United States.

b. Plaintiff stated that the relevance of this testimony was to show an atmosphere at the Clinic which treats Caucasians more favorably, upon the inference from the circumstances of her IDE appointment that Brecht must have been offered the IDE status because of her race, Caucasian.

7. Plaintiff Julia Borja Emmanuel

a. Plaintiff Emmanuel testified that the action of the Clinic Board on July 10, 2003 caused her demotion, a significant loss in compensation, and long term and severe mental distress. Plaintiff testified that it is her strongly held belief that the Board discriminated against her because she is Chamorro. Plaintiff stated that her belief is supported by a history of discrimination finally resulting in the discriminatory conduct of the Board in July 2003. The Plaintiff's testimony described specific incidents and events that she believes support her case against the Clinic:

• During the early days of Plaintiff's employment, a

19

| | |
|---|---|
| 1 | supervisor at the Clinic would not respond when the |
| 2 | Plaintiff called her by her first name, but insisted that |
| 3 | Plaintiff address her formally, while at the same time she |
| 4 | allowed other Caucasian employees to address her |
| 5 | informally. |
| 6 | • When Frances Mantanona lost her IDE-comparable benefits |
| 7 | package in 1999, the conduct of the Board and of then- |
| 8 | Administrator Weidemann, as to his allegation that |
| 9 | Mantanona was not meeting his expectations, was |
| 10 | discriminatory conduct. |
| 11 | • Jordan Urban, a Caucasian, came from another General |
| 12 | Conference Division to work at Adventist World Radio, a |
| 13 | subsidiary of the Mission, and was granted IDE benefits |
| 14 | when he began working for the Clinic, ten years after his |
| 15 | arrival on Guam. |
| 16 | • When Administrator Mahoney returned to Guam immediately |
| 17 | after the shooting incident at the Clinic in 2001 he |
| 18 | completely ignored the efforts or assistance of Plaintiff. |
| 19 | Mahoney returned to the Clinic after the shooting and the |
| 20 | initial police response. Plaintiff had been present at the |
| 21 | time of the incident and had handled the Clinic's response, |
| 22 | including her identification of the person responsible for |
| 23 | the shooting. Plaintiff states that Mahoney did not rely |
| 24 | on her for information about the shooting and the status of |
| 25 | the Clinic, but instead ignored her and told her to go |
| 26 | away. |
| 27 | |
| 28 | 20 |

- The treatment of Roger Natividad by the Clinic, specifically the loss of benefits, was discriminatory.
- Clinic employees made false statements about Roger Natividad being a poor worker.
- Jolene Brecht received IDE status because she was Caucasian.
- Administrator Mahoney required her to report to CFO Reese in order to belittle her.
- The Clinic and Administrator Mahoney built a false case to show that her HR position was overpaid.
- Administrator Mahoney interfered with her management responsibilities by interfering with her support staff.
- Termination of her husband's janitorial services contract with the Clinic was an act of discrimination.
- After the lawsuit was filed, Church members tried to make her feel guilty for filing the lawsuit.
- The treatment of Richard Brecht's misconduct by the Clinic was less punitive than it would have been if he had not been Caucasian.
- Administrator Mahoney, Jordan Urban and CFO Reese discussing in a meeting that Plaintiff has a "local cultural mind set."
- After the lawsuit was filed, Plaintiff did not receive an invitation to a Clinic Christmas gathering until it was too late to attend.

21

1    8.    Ed Emmanuel

2         a.    Ed Emmanuel, Plaintiff's husband, testified that his
3    janitorial services company lost its contract with the Clinic
4    after his wife brought this lawsuit.  Plaintiff presented this
5    testimony as evidence of discriminatory conduct by the Clinic,
6    and to show that Plaintiff and her family were discriminatory
7    targets of the Clinic.

8         b.    Ed Emmanuel also testified that his wife was
9    ostracized from the SDA community on Guam after filing this
10   lawsuit, and testified that the reclassification of Plaintiff's
11   position has negatively impacted the entire family, and has
12   directly and negatively effected the emotional state and
13   stability of the Plaintiff.

14   9.    George Emmanuel

15        a.    George Emmanuel, Plaintiff's son, testified that his
16   mother was ostracized from the SDA community on Guam after
17   filing this lawsuit, and testified that there were negative
18   effects from the reclassification of Plaintiff's position on her
19   emotional state and home life.

20   F.    Trial Testimony - Clinic Board Members

21        There were seven members of the Clinic Board of Directors
22   present at the meeting of the Board on July 10, 2003.  All of
23   the members, except the Chairman Pastor Jano, voted on the
24   decision to demote/reclassify Plaintiff and remove some of her
25   benefits.  Four of the members, present at the meeting,
26   testified at the trial - Pastor Jano, Violet Cruz, Michael

27

28                                   22

Mahoney, and Kerstan Reese.

1. Pastor Remenster Jano

a. Pastor Jano testified that the Clinic was in bad financial shape in the time period leading up to July 2003, and that he and other Board members shared the belief that the Clinic needed to develop cost-saving measures and to cut expenses. He explained that this was the reason that the Ad Hoc Committee was formed in the spring of 2003.

b. Pastor Jano testified that during discussions to reclassify Plaintiff's position and reduce the Plaintiff's total compensation, he voiced his positive opinions of Plaintiff and encouraged the Clinic to think of the impact on local leadership.

c. Pastor Jano testified that he served as the Board Chairman during the Board's July 10, 2003 meeting and was present for the vote to reclassify Plaintiff's position, but as he was the Chairman, he did not participate in the vote.

d. Pastor Jano counted the votes at the July 10, 2003 meeting and testified that the vote was unanimous.

e. Pastor Jano testified that he believed the decision to reclassify Plaintiff and reduce her benefits was made for cost savings reasons.

2. Violet Cruz

a. Cruz, like Mantanona and Natividad, was called by Plaintiff in support of her contention of the existence of a pattern or practice of discrimination by the Clinic. As a

23

1  Clinic Board Member, Cruz's testimony was also relevant on the
2  issue of whether the July 10, 2003 Board vote to reclassify
3  Plaintiff's position constituted discrimination.

4      b.    Cruz, a female Caucasian married to a Chamorro,
5  retired as a nurse practitioner at the Clinic and is now a
6  Clinic Board Member.  Plaintiff introduced evidence that Cruz
7  had difficulty obtaining a retirement package that would cover
8  benefits for her family, and alleged that this was because she
9  was married to a Chamorro man.  However, Cruz testified that at
10 no time during the retirement application process did she report
11 that her husband was Chamorro.  Moreover, Cruz explained that
12 the confusion surrounding her retirement package stemmed from
13 the fact that her husband had a retirement package, similar to
14 hers, and that the confusion was amicably resolved after a short
15 while.  Cruz did not believe her husband's race played any part
16 in her dispute with the Clinic.

17     c.    The Court finds Cruz's testimony to be credible, and a
18 forthright account of her dealings with the Clinic in obtaining
19 her retirement package.  Plaintiff presented no evidence to
20 contradict or dispute Cruz's explanation that her husband's race
21 played no part in her dispute with the Clinic.

22     d.    With respect to the Board's July 10, 2003 vote, Cruz
23 testified that during the Board's discussions of the Clinic's
24 financial situation, the Board was informed that Plaintiff
25 earned more than one of the Clinic's doctors.  Cruz testified
26 that the Board concluded that doctor salaries could not be cut

27

28                                24

1  because they were already earning less than what they could earn
2  in private practice.

3      e.   Cruz testified that if it were not for the financial
4  crisis, the Board would not have had to reclassify Plaintiff's
5  position or the Administrative Secretary position.

6      f.   Cruz testified that her vote at the Board's July 10,
7  2003 meeting, in favor of reclassifying Plaintiff's position,
8  was in no way motivated by Plaintiff's race or gender.  Cruz
9  also testified that she believed that no one else's vote was
10 motived by Plaintiff's race or gender.

11 3.   Michael Mahoney

12     a.   Mahoney testified that before the July 10, 2003 Board
13 meeting, he came to the Board with concerns regarding
14 Plaintiff's job performance, specifically complaints by Clinic
15 employees that Plaintiff had demeaned staff and delayed
16 paperwork.  He had already discussed these concerns with
17 Plaintiff, and wrote a letter to her in February 2003 giving
18 specific examples of the complaints he had received from other
19 Clinic employees.

20     b.   Mahoney testified that the Clinic was suffering from
21 financial losses in 2003 and that the Clinic's finances had been
22 deteriorating for some time.

23     c.   Mahoney testified that his vote at the Board's July
24 10, 2003 meeting, in favor of reclassifying Plaintiff's
25 position, was in no way motivated by Plaintiff's race or gender.

26     d.   Mahoney testified as to how he went about complying

27

28                              25

with the Board's directive that he determine the salary for the new HR Manager position. In order to determine the market wage on Guam for an HR Manager position, Mahoney contacted a competitor, Pacificare, and another company in the healthcare industry, Staywell, about the salary ranges of its HR directors. These two organizations were the only healthcare organizations on Guam similar in size to the Clinic. He learned from his contacts that $42,000 to $47,000 was an appropriate salary range. Mahoney also learned that of the two HR directors at Pacificare and Staywell, one had a master's degree in HR and another had a bachelor's degree. Plaintiff held no post-high school degree.

e. Mahoney testified that he also considered the impact of the benefit reduction to Plaintiff. At the time Plaintiff's benefits were reduced, both of her sons had completed their schooling, thus, Plaintiff no longer received the educational allowance benefit for her dependents.

f. Based on Mahoney's report, Plaintiff's salary for the new HR Manager position was set at $46,000. A salary of $46,000 was roughly equivalent to what she had received as the HR Director. The key difference in her new compensation package was the loss of the IDE-comparable benefits. Because of the Board vote, she would now receive only the standard local hire benefits.

g. Mahoney testified that in order to accommodate Plaintiff's reduction in benefits, the Clinic also decreased

26

1  Plaintiff's responsibilities.  In particular, Plaintiff was no
2  longer responsible for administering the co-pay insurance plan
3  as part of her HR duties.  Both Plaintiff and Mahoney testified
4  that this task was difficult and time-consuming.

5       h.   Mahoney gave the following testimony regarding
6  incidents which Plaintiff testified to in support of her case
7  against the Clinic:

8  •    He was off the island during the shooting incident at the
9       Clinic in 2001, on his way to attend his father's funeral.
10      When he returned to Guam, immediately after learning of the
11      shooting, he was focused on communicating with the police
12      and government officials.  He was tired and frustrated.  He
13      did not intentionally ignore Plaintiff or dismiss her
14      efforts because of a discriminatory motive.

15 •    Any discussion that Plaintiff operates on a "local cultural
16      mind set" referred to Plaintiff believing it is acceptable
17      to give employment preferences to family, as she helped her
18      son gain employment at the Clinic, as well as attitudes
19      regarding work-related criticism and discipline.  The
20      specific comment in question was made at a Clinic meeting
21      on September 21, 2001, at which Mahoney, Jordan Urban, and
22      CFO Reese were present.  The minutes reflect that Reese was
23      concerned with the appointment of Plaintiff's son as a
24      college summer hire - Reese stated that "he was hired
25      without the position first being advertised and the
26      possibility of nepotism being an issue could open the

27

28                              27

Clinic for a lawsuit." The minutes then reflect that it was discussed that "perhaps Julie [Plaintiff] needed training in better dealing with personnel. However, it was brought out that Julie operates on a local cultural mindset and it is difficult to take any aggressive administrative action against her because of her being Chamorro and because of 'Adventist' politics." Pl. Exh. 37. Mahoney testified that nepotism is regarded as a common and uncontroversial practice on Guam, and that is what the "local cultural mind set" comment was intended to refer to.

- He did not construe Plaintiff's job performance in a false light - he had legitimate concerns regarding Plaintiff's job performance based on complaints from Clinic employees.

- After Richard Brecht's misconduct at the Clinic, he told Brecht that if he wanted to remain at the Clinic he had to pay restitution, attend rehabilitation, there would be a cut in his pay, his position would be demoted, and he would have to engage in random drug tests. Mahoney testified that the action taken was not effected by the fact that Brecht was Caucasian.

- Roger Natividad's demotion was based upon concerns regarding his job performance and violation of the Clinic's no smoking policy, and was not effected by the fact that Natividad was Filipino.

4. <u>Kerstan Reese</u>

   a. Reese did not appear at trial, but stated in his

28

deposition, which was entered into the record at trial, that the Clinic was suffering from financial losses leading up to 2003 and that as CFO, he had discussed the Clinic's poor financial condition with the Board before their July 10, 2003 meeting.

b. Reese stated in his deposition that he believed he had not voted in favor of reclassifying the HR Director position. He stated that he had voiced concerns to the Board that reclassifying Plaintiff's position, where this was not part of an across-the-board reclassification, might have legal implications if viewed as an act of discrimination.

5. The remaining members of the Board who had voted at the July 10, 2003 meeting, Dr. Bevan Geslani, Reggie Leach, and Richard Ludders, were not called as witnesses. Trial testimony did identify Dr. Bevan Geslani as the Clinic Medical Director, as Filipino, and as the Chair of the Ad Hoc cost-savings committee. There was no trial testimony offered regarding Leach or Ludders as to their relation to the Clinic other than as Board members, as to ethnicity, or as to conduct at the July 10, 2003 meeting other than their affirmative votes on the action taken as to the Plaintiff.

CONCLUSIONS OF LAW

A. Plaintiff's Theory of the Case: Disparate Treatment or Disparate Impact

1. A plaintiff alleging discrimination under Title VII may proceed under two theories of liability: disparate treatment or disparate impact. Watson v. Fort Worth Bank & Trust, 487 U.S.

29

977, 986-87 (1987). In this case, Plaintiff argues that liability is established under both a disparate treatment and disparate impact theory.

2. Plaintiff's disparate treatment theory claims that she was reclassified and lost her IDE-comparable benefits because she is Chamorro. Plaintiff maintains that the July 10, 2003 Board vote to demote/reclassify her position and reduce the position's benefits was an act of discrimination by the Board. Plaintiff also grounds her disparate treatment claim on the existence of a pattern and practice by the Board to discriminate against Chamorro employees.

3. Plaintiff alleges a disparate impact theory on the basis that the "IDE employees are only recruited from the Mainland" and those employees "hired on Guam are not given IDE status." Plaintiff concludes a disparate impact because "the majority population on Guam is Chamorro." Pl. Post Trial Brief at 17.

B. Disparate Treatment by Pattern and Practice

1. By demonstrating the existence of a discriminatory pattern or practice, a plaintiff may establish a presumption that he or she has been discriminated against. Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 875 (1984). A discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue. Diaz v. American Telephone & Telegraph, 752 F.2d 1356, 1363 (9th Cir. 1985). Such evidence must show that disparate treatment is Defendants'

30

"standard operating procedure." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 (1977); Obrey v. Johnson, 400 F.3d 691, 694 (9th Cir. 2005).

2. Both statistical evidence and anecdotal evidence may be used to establish a discriminatory pattern or practice. See Obrey, 400 F.3d at 698. In this case, Plaintiff relies exclusively on anecdotal evidence.

3. Anecdotal evidence about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff. See, e.g., Wyvill v. United Companies Life Ins. Co., 212 F.3d 296, 302 (5th Cir. 2000). In Wyvill, the plaintiff's anecdotal evidence of discrimination regarding persons with different supervisors than the plaintiff, who worked in different parts of the company, and whose adverse employment action was removed in time from the plaintiff's termination could not be probative of whether age was a determinative factor in the plaintiff's adverse employment action. Id.

4. Plaintiff's argument that the adverse action taken against her was part of a pattern or practice by the Clinic to discriminate against Chamorro persons depends on the evidence as to separate events described in her testimony and that of Robert Stahlnecker, Frances Mantanona, Roger Natividad, Ed Emmanuel, Violet Cruz, Richard Brecht, and Jolene Brecht.

    a. Robert Stahlnecker: At most the testimony of this witness establishes that some 20 years ago he was turned down by

31

some unidentified persons when he applied for a position with the SDA Church on Guam, and that some time later an unidentified person told him that this happened because of a perception that he sided too much with the locals. The incident was not connected to the Clinic, or its Board, that existed at the time, and it is of no weight in establishing the current practices of the Clinic, or the actors and circumstances involved in Plaintiff's claim of discrimination.

b. Frances Mantanona: The Court finds that evidence of Mantanona's demotion does not help establish a discriminatory pattern or practice at the Clinic. Mantanona's testimony provided an explanation of the situation surrounding the action of the Clinic and of her decision to leave the Clinic in 2000, as well as her direct testimony that race played no part in the Clinic's decision to reduce her benefits. This evidence provides no support for Plaintiff's argument that Mantanona's difficulties with the Clinic in 1999 and 2000 are attributable to discrimination. Plaintiff argues, as already noted, that the Court should consider this testimony as biased. The Court has already totally rejected that argument and observes, in addition, that if the Mantanona testimony was considered biased it would be simply dropped from the Court's consideration but no new and different testimony would be added in support of Plaintiff's assertions on this matter.

c. Roger Natividad: The testimony of this witness did not establish that his reclassification and reduction of

32

1 benefits were attributable to discrimination. The Court also
2 notes that Plaintiff has failed to explain how Natividad's
3 reclassification is relevant to the issues in this case, in
4 light of the facts that Natividad is a male Filipino and
5 Plaintiff is a female Chamorro.

6    d.  Richard Brecht: Plaintiff argued that the relevance
7 of this testimony was to show an atmosphere at the Clinic which
8 treats Caucasians more favorably, premised on the asserted
9 conclusion that Richard Brecht was "let off easy" because of his
10 race, Caucasian. Even if the Clinic response could somehow be
11 considered "easy," there was no testimony as to any other
12 incident where an employee similarly situated to Brecht was not
13 "left off easy." In any event, the scope of disciplinary
14 measures taken with respect to Brecht's misconduct is of little
15 or no relevance to the issue of whether the Board discriminated
16 against Plaintiff.

17    e.  Jolene Brecht: Plaintiff maintains that from the
18 circumstances of Brecht receiving an IDE appointment, Brecht
19 must have been offered the IDE status because of her race,
20 Caucasian. The Court finds that this conclusion is not
21 supported by the testimony. The evidence does not establish
22 that IDE type benefits are restricted to Caucasians, or that
23 maintenance of the IDE concept in SDA activities has any
24 discriminatory purpose or effect.

25    f.  Ed Emmanuel: The Court finds that Ed Emmanuel's loss
26 of his contract with the Clinic, occurring after this lawsuit
27
28                              33

1 | was filed and involving its own set of circumstances and third-
2 | party actors, is not relevant to whether Plaintiff was
3 | discriminated against when the Board reclassified her position
4 | in July 2003.

5 |      g.   Violet Cruz:  The Court finds that evidence of Cruz's
6 | difficulties in obtaining a retirement package does not
7 | establish a discriminatory pattern or practice at the Clinic
8 | against Chamorros.  Given Cruz's explanation of the situation,
9 | and her testimony that her husband's race played no part in her
10 | dispute with the Clinic, Plaintiff has failed to establish that
11 | Cruz's difficulty in obtaining a retirement package has any
12 | discriminatory significance.

13 |      h.   Jordan Urban:  Testimony that Urban, a Caucasian, was
14 | granted IDE benefits when he began working for the Clinic, ten
15 | years after his arrival on Guam, does not establish that Urban
16 | was offered the IDE status because of his race.  Moreover,
17 | evidence at trial established that the Clinic offers IDE and
18 | IDE-comparable benefits to a wide range of ethnicities.

19 |      i.   Plaintiff:  Plaintiff's pattern or practice evidence
20 | also consisted of anecdotes regarding her own treatment at the
21 | Clinic.  The Court finds that even if all of the incidents
22 | occurred as Plaintiff testified, they do not establish a
23 | discriminatory pattern or practice at the Clinic.

24 | •    The conduct of a supervisor in the early days of
25 |      Plaintiff's employment, in not allowing Plaintiff to
26 |      address her informally, does not show a discriminatory
27 |
28 |                           34

motive or reflect a discriminatory atmosphere at the Clinic
which would be relevant to the Board's July 10, 2003 vote.

- Administrator Mahoney's conduct in ignoring or dismissing
  the Plaintiff after the shooting incident at the Clinic in
  2001 is of little discriminatory significance, particularly
  given Mahoney's testimony regarding the stressful nature of
  that event and his explanation of why he handled the
  situation as he did.

- Plaintiff presented no evidence that Administrator Mahoney
  requiring Plaintiff to report to CFO Reese had anything to
  do with Plaintiff's race, or that this type of supervision
  was an uncommon practice at the Clinic.

- Plaintiff's allegation that Administrator Mahoney
  interfered with her management responsibilities by
  interfering with her support staff was not sufficiently
  developed with specific incidents. Moreover, there was no
  evidence that this type of supervision was an uncommon
  practice at the Clinic.

- SDA Church members questioning Plaintiff about the lawsuit,
  after it was filed, does not have any bearing on a pattern
  or practice at the Clinic that led to the Board's July 10,
  2003 vote.

- Any discussion that Plaintiff operates on a "local cultural
  mind set" does not establish a discriminatory pattern or
  practice at the Clinic. There is nothing wrong per se with
  a recognition of cultural differences, and the minutes of

35

1    the September 21, 2001 meeting, at which the specific
2    comment was made, do not reflect that the comment was made
3    in a discriminatory manner.

4  •  No conclusion can be drawn from the fact that after the
5     lawsuit was filed, Plaintiff did not receive an invitation
6     to a Clinic Christmas gathering until it was too late to
7     attend, moreover there was no evidence that tied this
8     incident to the Defendants.

9  C.  Disparate Treatment by Vote of the Board

10  1.   The disparate treatment model involves proof of a discrete
11  act of intentional discrimination against a single individual.
12  Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 256
13  (1981).

14  2.   To establish a Title VII disparate treatment case, a
15  plaintiff must show that he or she (1) is a member of protected
16  class; (2) was otherwise qualified for the position or
17  satisfactory performance of the job; (3) an adverse employment
18  decision; and (4) different treatment than those similarly
19  situated outside of the protected class.  McDonnell Douglas
20  Corp. v. Green, 411 U.S. 792, 802 (1973).  If the plaintiff
21  establishes a prima facie case of discriminatory action, the
22  defendant must articulate a legitimate, nondiscriminatory basis
23  for the action.  Texas Department of Community Affairs v.
24  Burdine, 450 U.S. 248, 252-53 (1981).  Should the defendant go
25  forward with evidence on this issue, the plaintiff then has the
26  opportunity to prove that the legitimate reason offered by the

27

28                              36

defendant was not its true reason, but was instead a pretext for its discriminatory conduct. Id. In any event the overall burden of proof of discriminatory conduct remains with the Plaintiff. Id. at 253, 256.

3.    Plaintiff's disparate treatment theory alleges that the adverse action taken against her by the vote of the Board on July 10, 2003 was an act of discrimination. Liability of the Defendant Clinic, then, depends upon a group decision by six members of its Board, and requires an analysis of the vote of each of those six individuals: Violet Cruz, Reggie Leach, Administrator Michael Mahoney, CFO Kerstan Reese, Medical Director Dr. Bevan Geslani, and Dr. Richard Ludders.

4.    As a preliminary matter, although the weight of the evidence supports a conclusion that he voted with the majority, the Court finds that the issue of how Reese voted is not determinative of the issues in this case. If Reese voted in favor of reclassifying the position, the group decision does not depend on this single vote and there is nothing in his deposition or in any other testimony at the trial which establishes that his vote was a discriminatory act. If Reese voted in opposition to reclassifying the position, then clearly this could neither be an adverse act of discrimination on the basis of race or sex by Reese as an individual, nor proof of a discriminatory group decision by the Board.

5.    Although there must be a majority vote for an adverse action to be taken by a group decision, a Title VII plaintiff

37

need not show that everyone, or even a majority, of a group of
decisionmakers was biased in order to prove that a decision was
infected by discrimination. Price Waterhouse v. Hopkins, 490
U.S. 228, 256 (1989). Discrimination may be inferred where the
evidence shows that a biased group member influenced the group's
decision, even when the influence appears facially neutral. Lam
v. University of Hawaii, 40 F.3d 1551, 1560 (9th Cir. 1994).

6.    In examining the motives of a group of individuals, courts
usually examine whether one of the decision-makers possessed an
impermissible discriminatory motive, and exercised that
motivation in influencing the other decision-makers. This
concept is otherwise known as the "cat's paw." Shager v. Upjohn
Co., 913 F.2d 398, 405 (7th Cir. 1990). In Shager, Judge Posner
found that the committee's decision to discharge the plaintiff
was tainted by the prejudice of a committee supervisor. Id.
Other courts following the cat's paw model require a showing
that the supervisor possessing discriminatory motives was the
cause of the adverse employment action. Llampallas v. Mini-
Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998);
English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1011
(10th Cir. 2001) (plaintiff must show that decision-maker
followed the biased recommendation without an independent
investigation).

7.    In this case there was a group decision by the seven member
Board of the Defendant Clinic to take the action against the
Plaintiff which is claimed by her to be an act of

38

discrimination. The group decision at issue was by six members of the Board. The direct issue is whether or not the evidence shows that any of the voting members of the Board cast a vote to cause an adverse action against the Plaintiff because she is a Chamorro person.

8. Pastor Remenster Jano, the Chair of the Board, did not vote. The evidence establishes beyond doubt that he did not take any discriminatory action or voice any discriminatory statement during the meeting of the Board.

9. Three of the Board members who voted to take the adverse action were not called as witnesses by either party. These three persons were:

- <u>Dr. Bevan Geslani</u>: Dr. Geslani was the Medical Director of the Clinic and the Chair of the Ad Hoc Committee which recommended the adverse action taken against the Plaintiff. There was evidence that Dr. Geslani is Filipino.

- <u>Reggie Leach</u>: There was no evidence as to his race or ethnicity.

- <u>Dr. Richard Ludders</u>: There was no evidence as to his race or ethnicity.

10. As to these three members of the Board, there is no evidence that they took any discriminatory action or voiced any discriminatory statement at the meeting of the Board.

11. Three of the voting members of the Board testified at the trial:

- <u>Kerstan Reese</u>: The Court has already discussed the

39

1   circumstances surrounding his vote and concludes that he
2   did not take any discriminatory action or voice any
3   discriminatory statement at the meeting of the Board.

4   • Violet Cruz: Cruz testified that she did not discriminate
5   against the Plaintiff in her vote to take the adverse
6   employment action on July 10, 2003. The Court heard all
7   the testimony of this witness, observed her demeanor, and
8   heard all the evidence which could be relevant to the
9   question of her state of mind at the time she voted. There
10  is no question but that this witness is entitled to full
11  credit as to her testimony; she did not discriminate
12  against the Plaintiff in any way.

13  • Michael Mahoney: Mahoney as the Administrator of the
14  Clinic played a significant role in the events at issue in
15  this trial. He was a member of the Ad Hoc Committee which
16  recommended the adverse action against the Plaintiff in the
17  first instance and was a voting member of the Board when
18  they adopted that action. Mahoney testified that he did
19  not vote against the Plaintiff because she was Chamorro.
20  Plaintiff argues that the Court should find that his
21  testimony was not credible and should find instead that he
22  discriminated against her. The salient evidence which
23  suggests discriminatory animus is the reference by Mahoney
24  to the "local mind set" of the Plaintiff. Mahoney
25  explained this as a recognition of cultural differences.
26  There is, of course, nothing wrong with a recognition of

27

28                                  40

culture, but such expression can reveal prejudice. The
Court heard the testimony on this matter and concludes that
Mahoney is a credible witness who did not take any
discriminatory action or voice any discriminatory statement
at the meeting of the Board when the adverse action was
decided. Moreover, there is no evidence that Mahoney
played a cat's paw role in this matter such that the vote
of any Board member was influenced by his actions. To the
contrary, it appears that in each instance the Board
members voted in expression of their own conscience.

12. In sum, the Court concludes that no member of the Board
influenced the vote of any other member, and that no member of
the Board cast a discriminatory vote against the Plaintiff.

13. At trial Plaintiff argued that the reasons articulated for
the Board's vote, specifically the financial losses suffered by
the Clinic, were a pretext for discrimination. Plaintiff
disputed the severity of the Clinic's financial condition and
argued that alternative cost-saving measures could have been
taken. However, the Court finds that the Clinic's negative
financial condition was established by the testimony of Violet
Cruz, Pastor Remenster Jano, Michael Mahoney, and Kerstan Reese,
and confirmed by the Clinic's financial reports admitted into
evidence and discussed at trial. The Clinic's financial
condition is a legitimate nondiscriminatory reason for
reclassifying Plaintiff's position, and absent evidence of a
discriminatory motive, courts do not second-guess business

41

1  judgments.  See Graefenhain v. Pabst Brewing Co., 827 F.2d 13,
2  20 (7th Cir. 1987).  A critique of the Defendants' business
3  judgment does not satisfy the Plaintiff's burden of producing
4  evidence of discrimination.  See Ahmed v. American Red Cross,
5  218 F.3d 932, 933 (8th Cir. 2000).

6  14.  The Court recognizes that even though an overall cost-
7  savings strategy has been adopted, that a specific
8  discriminatory act could be made a part of the overall strategy.
9  The Court finds, however, that this did not happen in this case.
10  As to the overall cost-savings strategy adopted by the Clinic,
11  the Court finds that it was justified as reasonable and
12  necessary and that it was not a pretext for discrimination.  As
13  to the specific action taken by the Clinic as to the Plaintiff,
14  the Court finds that it was not a discriminatory act taken
15  because she is a Chamorro woman.

16  15.  Plaintiff also argued that the Board's efforts to determine
17  the market wage for a HR manager position on Guam were a sham,
18  and this is evidence that the job performance and cost-saving
19  reasons articulated for the reduction of her total compensation
20  were a pretext.  However, trial testimony established that, in
21  fact, there was a belief held by some Board members that
22  Plaintiff was over-compensated for the position she held before
23  her position was reclassified.  Violet Cruz and Michael Mahoney
24  both testified to this effect.  While Mahoney could have
25  conducted a good deal more comprehensive analysis of the market
26  salary for a HR position on Guam, Mahoney's testimony at trial

27

28                                42

1  established that he made a forthright attempt to comply with the
2  Board's directive that he determine an appropriate salary for
3  the newly classified HR Director position.

4  16.  Given the foregoing findings on Plaintiff's pattern or
5  practice evidence and the findings regarding the conduct of the
6  Clinic Board at the July 10, 2003 vote, the Court finds that
7  Plaintiff has failed to establish a case of disparate treatment.

8  D.  Disparate Impact

9  1.  Disparate impact cases involve employment practices which
10  are neutral on their face, but have a discriminatory effect
11  without justification based on business necessity.  Shutt v.
12  Sandoz Crop Protection Corp., 944 F.2d 1431, 1433 (9th Cir.
13  1991); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1423 (9th Cir.
14  1990).

15  2.  In order to establish a prima facie case of disparate
16  impact, the plaintiff must:  (1) identify the specific
17  employment practices or selection criteria being challenged; (2)
18  show disparate impact; and (3) prove causation by way of
19  statistical evidence.  Watson v. Fort Worth Bank & Trust, 487
20  U.S. 977, 992-95 (1988).  The statistical disparities "must be
21  sufficiently substantial that they raise such an inference of
22  causation."  Id. at 995.

23  3.  Once the plaintiff establishes a prima facie case of
24  disparate impact, the burden of going forward with evidence
25  shifts to the defendant who may either discredit the plaintiff's
26  statistics or proffer statistics of his own which show that no

27

28                                  43

1  disparity exists.  Id. at 996.  The employer must also produce
2  evidence that its disparate employment practices are based on
3  legitimate business reasons.  Thereafter, the plaintiff must
4  show that other devices without a similarly undesirable
5  discriminatory effect would also serve the employer's legitimate
6  interests.  Id. at 998.

7  4.  Plaintiff has not identified which specific employment
8  practice or selection criteria she is challenging, and has
9  proffered no statistical evidence to support a disparate impact
10 claim.  In fact, Plaintiff's allegations of disparate impact
11 were never pled in pre-trial filings and not developed until
12 closing argument.

13 5.  The only statistical evidence introduced at trial was
14 introduced by the Defendants, in the form of two charts
15 providing the ethic and gender break-down of the Clinic in mid-
16 2001 and mid-2004.  These charts show that the Clinic employees
17 have a wide range of ethnicities, and evidence at trial
18 established that IDE and IDE-comparable benefits are provided to
19 a wide range of ethnicities.

20 6.  Plaintiff has failed to prove a case of disparate impact.

21 E.  Liability of Defendant Mission

22 1.  The only direct evidence Plaintiff presented on the
23 liability of Defendant Mission was Pastor Rememster Jano's
24 testimony.  Pastor Jano's testimony established the hierarchy of
25 the SDA organizations operating on Guam and in the surrounding
26 region.  He stated that the Defendant Clinic is one of a number

27

28                                44

1　of activities under the supervision of the Defendant Mission.

2　2.　There was no evidence of any direct action taken by

3　Defendant Mission against Plaintiff.　Defendant Mission's

4　liability in this case would be based solely on the SDA

5　hierarchy and principles of derivative liability.

6　F.　Defendants' Argument on Limitation of Damages

7　1.　At trial Defendants' alleged that Plaintiff had engaged in

8　misconduct, by obtaining and disclosing confidential Clinic

9　documents at the trial, and contended that this conduct limits

10　an award of back pay and precludes front pay and reinstatement.

11　See McKennon v. Nashville Banner Publishing Co., 513 U.S. 352

12　(1995).

13　2.　In light of this Order, finding that Plaintiff has failed

14　to prove a case of discrimination under Title VII, and there is

15　no issue of damages to be considered, the Court will not address

16　this separate allegation of the Defendant.

17

18　ACCORDINGLY, the Court finds that Plaintiff has failed to

19　prove that Defendants' employment action discriminated against

20　her under Title VII.

21　IT IS SO ORDERED

22

23　Dated in Oakland, California:　March **6**, 2006

24

25

　　　　　　　　　　　　　　　　　　D. Lowell Jensen

26　　　　　　　　　　　　　　　United States District Judge

27

28　　　　　　　　　　　　　　45

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

FILED

DISTRICT COURT OF GUAM

MAR - 7 2006

MARY L.M. MORAN
CLERK OF COURT

JULIA BORJA EMMANUEL,           )
                                )
            Plaintiff,          )
                                )
        v.                      )
                                )   No. C-03-00030
GUAM SEVENTH-DAY ADVENTIST      )
CLINIC, GUAM-MICRONESIA         )
MISSION, MICHAEL MAHONEY, and   )
DOES 1 through 10,  ·           )
                                )   **FINDINGS OF FACT AND**
            Defendants.         )   **CONCLUSIONS OF LAW**
_____)

This matter came on for a bench trial which was held on December 6, 2005 through December 13, 2005. Throughout these proceedings, Peter C. Perez and Peter J. Sablan appeared on behalf of Plaintiff Julia Borja Emmanuel. David Ledger and Elyze McDonald appeared for Defendants Guam Seventh-day Adventist Clinic and Guam-Micronesia Mission. This matter is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. against Defendants Guam Seventh-day Adventist Clinic and Guam-Micronesia Mission. Defendant Michael Mahoney was dismissed from this matter July 22, 2004 and Does 1 through 10 were dismissed on November 29, 2005. In an Order dated July 5, 2005, the Court found that Plaintiff had waived her right to a jury trial and Defendants' motion to strike Plaintiff's demand for a jury was granted.

This Order sets forth the Final Findings of Fact and Conclusions of Law of this Court.

1

ORIGINAL

**FINDINGS OF FACT**

A. <u>Plaintiff Julia Borja Emmanuel</u>

1. Plaintiff Julia Borja Emmanuel (Plaintiff) is a citizen of the United States and a resident of Guam.

2. Plaintiff is Chamorro, the ethnicity of the indigenous people of Guam, and she is female.

3. Plaintiff was employed by Defendant Guam Seventh-day Adventist Clinic (Clinic) in December 1990 and served as its Human Resources (HR) Director from September 1, 1992 until September 1, 2003.

B. <u>Guam Seventh-day Adventist Clinic and Guam-Micronesia Mission</u>

1. The Guam Seventh-day Adventist Clinic (Clinic) and the Guam-Micronesia Mission (Mission) are non-profit organizations part of the Seventh-day Adventist Church (SDA).

2. The Defendant Clinic is one of a number of activities under the supervision of the Defendant Mission. The activities supervised by the Mission include churches, schools, and medical clinics in the several islands within the territory of the Mission. At all periods pertinent to this case, Pastor Remenster Jano, a United States citizen of Ponapean origin and ethnicity, served as the Mission President.

3. The Seventh-day Adventist General Conference is the governing body of the SDA.

4. The SDA is divided into thirteen regional Divisions for administrative purposes. Each Division is further subdivided

2

1 into several Missions. The Guam-Micronesia Mission is within
2 the Southern Asian-Pacific Division of the SDA.
3 5. The governing body of the Clinic is a Board of Directors
4 (Board) appointed by the Mission.
5 6. Day-by-day supervision of the Clinic is run by an
6 Administrative Council (Ad Council) of Clinic employees selected
7 by the Board. The Clinic Administrator works under the Ad
8 Council.
9 7. The Clinic employs approximately 200 employees.
10 8. The Clinic employs Interdivision Employees (IDEs), contract
11 employees, and local resident hires.
12 9. At the Clinic, IDEs are generally healthcare professionals,
13 primarily physicians and dentists, who maintain their permanent
14 residency in a Division other than the Southern Asia-Pacific
15 Division and travel to and reside temporarily on Guam to work
16 for the Clinic.
17 10. The Clinic, as a SDA organization, requires that its
18 healthcare providers, regardless of whether they are IDEs or
19 hired locally, belong to the Seventh-day Adventist faith. The
20 IDEs are "called" to their work at the Clinic by the General
21 Conference of the SDA, and their service is regarded to be akin
22 to missionary service.
23 11. The law of Guam requires that medical healthcare providers
24 practicing in Guam must be licensed in the United States.
25 12. The Clinic recruits a majority of its healthcare providers
26 from other SDA Divisions, the Northern American Division in
27
28 3

1  particular, as it is difficult to find persons of the Seventh-
2  day Adventist faith with the requisite healthcare qualifications
3  and licensing on Guam or in the Southern Asia-Pacific Division.
4  13.  Healthcare providers working at the Clinic, whether IDEs or
5  not, generally make less than they would be paid in the United
6  States.
7  14.  The Clinic offers an IDE benefits package that includes a
8  housing allowance, a tax subsidy, vacation time with paid off-
9  island travel, and tuition benefits for dependents.  The package
10  is designed to assist IDEs while they are displaced from their
11  homes in the United States or country of origin, and to help
12  make up the pay disparity which accompanies their work at the
13  Clinic.
14  15.  Local resident hires, as opposed to IDEs, are employees
15  hired from the Guam community at large.  Local resident hires
16  receive a standard benefit package which includes, among other
17  items, heath and dental insurance and a life insurance option.
18  16.  Contract employees of the Clinic may have employment
19  contracts which include benefits in addition to the standard
20  local hire benefit package.  These contract benefits may be
21  comparable to the IDE benefit package.  Contract employees
22  negotiate their contracts with the Clinic on a case-by-case
23  basis.  For example, the current Clinic Administrator, Frances
24  Mantanona, although a resident of Guam and not an IDE, has a
25  negotiated contract with the Clinic which includes IDE-type
26  benefits.
27
28                                    4

17. At the Clinic, in her role as HR Director, Plaintiff was a locally hired contract employee. Her benefits before the 2003 reclassification of the HR Director position included car depreciation assistance, car insurance, a utility allowance, tuition subsidies for her children's education, vacation time, subscriptions to professional journals, continuing education with expenses covered for tuition and travel to attend a continuing education course, and a homeowner's allowance. These benefits were comparable to IDE benefits.

18. The Clinic and the Mission generally commended Plaintiff for her work performance and awarded her regular incremental raises. <u>See, e.g.</u>, Plaintiff's Exhibits (Pl. Exhs.) 7, 14-17, 20, 62. She was appointed to the Administrative Council of the Clinic. She was entrusted with responsibilities, such as negotiating insurance contracts. She was also an invitee on the Mission's Executive Committee. She was voted to act as the Mission's Children's Minister and to be a spiritual leader for employee retreats.

19. Michael Mahoney became the Clinic's Administrator in mid-2001, and served as Administrator during the time period in 2003 when the activities which gave rise to this lawsuit occurred.

20. At the time Mahoney became Administrator, the ethnic breakdown of the Clinic's non-healthcare provider staff and management was: 51% Filipinos, 20% Chamorros, 14% Caucasians, 6% Pacific Islanders, 3% Caucasian-Chamorros, 2% African-American, 2% other, 1% mixed and 1% Chinese. Defendants'

5

Exhibit (Def. Exh.) D. Among healthcare providers, the ethnic breakdown was 25 Caucasians, 1 Nigerian, 2 Filipinos, 2 Hawaiians, 5 Koreans, 1 Peruvian, 2 Japanese, and 2 Indonesians. Def. Exh. D.

21. In mid-2004 when Mahoney ceased being Administrator, and after Plaintiff brought this lawsuit, the ethnic breakdown of the Clinic's non-healthcare provider staff and management was: 51% Filipinos, 22% Chamorros, 15% Caucasians, 6% Pacific Islanders, 1% African-American, 2% other, 2% mixed and 1% Chinese. Def. Exh. E. Among healthcare providers the ethnic breakdown was: 22 Caucasians, 1 Nigerian, 3 Filipinos, 1 Hawaiian, 5 Koreans, 1 Peruvian, 2 Japanese, 2 Indonesians, and 1 female Chamorro. Def. Exh. E.

C. The Board of Director's Decision Regarding Plaintiff's Employment Position and Benefits

1. Over the years the Clinic had been generally fiscally sound but began to suffer financial losses as a result of the lasting effects of the bankruptcy of a local insurance company, GMHP, to which a large number of patients seeking treatment at the Clinic belonged. The Clinic continued treating patients in spite of the lack of insurance coverage by GMHP. Trial testimony established that eventually, GMHP paid about thirty to thirty five cents on the dollar on the $1,000,000-plus amount owed to the Clinic. Testimony also established that the Clinic was recovering from a loss of business resulting from a shooting incident at the Clinic in 2001 where one person was killed.

6

2.    Financial statements introduced at trial confirmed that the
Clinic was operating at a loss in 2002 and 2003.   The evidence
established that the loss for 2002 was approximately $800,000
and that the projected loss for 2003 as of mid-2003 was believed
to be over $250,000.

3.    Mahoney, the Clinic Administrator during this time,
testified that the Clinic's financial condition made it
difficult to upgrade equipment, invest in infrastructure, and
recruit healthcare providers.   Pastor Jano testified that at one
point in time, Clinic officials went to the Mission asking for
prayers to help the Clinic meet payroll.   Violet Cruz, a Clinic
Board Member, also testified that the Clinic was having
financial difficulties.

4.    At a meeting of the Clinic Board in the spring of 2003, the
Board heard reports as to the financial condition of the Clinic
and voted to establish an Ad Hoc Committee on Savings and
Efficiency, to consider any actions the Board should take to
respond to the financial crisis.   The Board asked the Ad Hoc
Committee to develop and propose cost-cutting measures.   The Ad
Hoc Committee was comprised of:

- Administrator Michael Mahoney
- Chief Financial Officer (CFO) Kerstan Reese
- Jordan Urban, the Clinic's Chief Accountant
- Dr. Bevan Geslani, the Clinic's Medical Director
- Reggie Leach, a Board member
- Michael Robinson, another Clinic employee

7

5.   Dr. Geslani acted as Chairman of the Ad Hoc Committee.

6.   On May 28, 2003, based on a list of options prepared by Dr. Geslani, the Ad Hoc Committee devised a number of immediate measures to cut costs at the Clinic.  Pl. Exh. 46.

7.   Those immediate measures included:

- eliminating some of the benefits of the HR Director position and basing the salary on the market wage for such a position in Guam

- replacing the nursing manager position with a supervisory position with part-time nursing duties

- eliminating the customer service position

- instituting a hiring freeze

- re-negotiating janitorial contract services

- cross-training employees to become versatile in several positions

- eliminating overtime and temporary work

- eliminating paid paternity leave

- implementing a 72-hour pay period.

8.   The Ad Hoc Committee also recommended a number of intermediate/mid-range and long-term strategic cost-savings measures for the future.  Pl. Exh. 46.  The intermediate/mid-range plans included:

- studying the IDE status for a dental hygienist

- studying the IDE status for an administrative position

- reviewing the number of IDE staff of the Wellness Center

- reviewing the staffing level of the dental clinic

8

1 • reviewing the advertising budget
2 • eliminating floating holidays
3 • lumping sick time and other leave time
4 • shifting family practice physicians to more outpatient
5 clinic hours from hospital duties
6 • re-evaluating the need to have available guest apartments
7 • restudying the practice of comp time
8 • reviewing subsidy amounts
9 • studying the costs of mission trips for providers
10 9.    Finally, the Ad Hoc Committee recommended a long-term
11 strategic plan.    Pl. Exh. 46.    The long-term plan included:
12 • reviewing the provider loan amortization program for new
13 physicians/providers
14 • implementing policy of step-wise increase in percentage of
15 base salary for new physicians out of residency
16 • capping continuing education funds
17 • working on pharmacy software and inventory system
18 • working on staff level for purchasing and better inventory
19 • obtaining bulk discounts for medical and office supplies
20 • studying areas of redundancy in space needs
21 • reviewing requests of providers and scheduling of leaves
22 and vacations to avoid times of low provider presence in
23 the Clinic
24 • tracking new patients to see how they decided to come to
25 the Clinic
26 • developing a better way to scan records to save time
27
28                                    9

1  •    conducting a phone line audit and looking at alternatives

2       to phone cost

3  10.  The Ad Hoc Committee then presented its recommendations to

4  the Ad Council of the Clinic.

5  11.  On June 3, 2003, the Ad Council adopted a number of the Ad

6  Hoc Committee's immediate recommendations.  For example,

7  consensus approval was reached to eliminate paid paternity

8  leave, to eliminate funding of support staff during mission

9  trips, to work on negotiating better pricing for pharmaceutical

10 medications and other supplies, and to implement use of volume

11 accounts.  The Ad Council forwarded the other recommendations of

12 the Ad Hoc Committee for action by the Clinic Board.  Pl. Exh.

13 47.

14 12.  The following Ad Council members were present at the June

15 3, 2003 meeting:

16 •    Plaintiff

17 •    CFO Kerstan Reese

18 •    Jolene Brecht

19 •    Michael Robinson

20 •    Dr. Bevan Geslani

21 •    Bob Wresch.

22 13.  On July 10, 2003, the Clinic Board met to discuss the

23 financial situation at the Clinic and to consider the Ad Hoc

24 Committee's recommendations on cost-saving measures.  The voting

25 members of the Board who were present at the meeting were:

26 •    Pastor Jano, a Ponapean

27

28                             10

1    •    Violet Cruz, a Caucasian married to a Chamorro

2    •    Reggie Leach

3    •    Administrator Michael Mahoney, a Caucasian

4    •    CFO Kerstan Reese, an African-American

5    •    Dr. Bevan Geslani, a Filipino

6    •    Dr. Richard Ludders

7    14.   After voting to accept CFO Reese's financial report

8    detailing the financial troubles at the Clinic, the Board

9    discussed possible cost-saving changes at the Clinic and held

10   votes on a number of the cost-saving measures proposed by the Ad

11   Hoc Committee.

12   15.   Among the cost-saving measures voted on, the Board voted to

13   reclassify the HR Director position to that of HR Manager.   The

14   vote changed the reimbursement of the position from that of a

15   salaried position to that of an hourly position.   The exact wage

16   for the HR Manager position was to be established by the

17   Clinic's Administrator and Medical Director.   All benefits for

18   the newly classified position would be equal to that of the

19   hourly positions at the Clinic and any additional benefits were

20   eliminated.

21   16.   The Board's reclassification decision meant that

22   Plaintiff's total compensation would be reduced and that

23   Plaintiff would receive the standard local resident hire benefit

24   package as opposed to the IDE-comparable benefits she had

25   previously received.

26   17.   Other cost-saving measures adopted by the Board at the July

27

28                                    11

1  10, 2003 meeting included review of the present janitorial
2  services contract, reclassifying the Administrative Secretary to
3  an hourly position, and not filling the position of the CFO,
4  which was about to become vacant on the announced resignation of
5  the incumbent CFO Kerstan Reese.  Pl. Exh. 56.  The Board also
6  voted to retain the services of Mahoney as Administrator and
7  Urban as Chief Accountant.  Pl. Exh. 56.  Mahoney did not
8  participate in the vote regarding his position, and had offered
9  to resign so that the Clinic could hire an Administrator with
10  lower salary expectations.
11  18.  All of the Board members present took part in the vote on
12  the decision to reclassify the HR Director position except for
13  Pastor Jano, who was acting as the Board Chairman and was not
14  required to vote.
15  19.  Trial testimony established that all of the six Board
16  members who took part in the vote on the HR Director position
17  voted in favor of reclassifying the position, with the possible
18  exception of CFO Reese.
19  20.  There was a dispute at trial over how Reese voted.  Pastor
20  Jano, Cruz, and Mahoney testified that the vote in favor of
21  reclassifying the HR Director position was unanimous.  Reese did
22  not appear at trial, but stated in his deposition, which was
23  entered into the record at trial, that he believed he had not
24  voted in favor of reclassifying the HR Director position.  The
25  minutes of the July 10, 2003 meeting do not reflect that anyone
26  voted in opposition to reclassifying the HR Director position.
27
28                              12

Pl. Exh. 56

D.   Plaintiff's Lawsuit

1.   Plaintiff filed this Title VII action on August 7, 2003,
and alleged that the Clinic discriminated against her on the
basis of her race, ethnic origin and gender.

2.   At closing arguments, Plaintiff conceded that she had not
proven a case of gender discrimination.

3.   After Plaintiff filed her lawsuit, Clinic management
reviewed alternatives to Plaintiff continuing in her position as
HR Manager.  Among the possibilities discussed with Plaintiff,
was an offer that she would be placed on administrative leave
with full pay, in exchange for Plaintiff's agreement to attend
classes at the University of Guam.  Plaintiff accepted this
offer.

E.   Trial Testimony - Non-Board Members

     In the following section, the Court describes the testimony
of the witnesses at trial, except for those witnesses who were
on the Clinic's Board and present at the July 10, 2003 Board
meeting, which will be described later in this Order.

1.   Robert Stahlnecker

     a.   Stahlnecker is a white male and member of the SDA
Church.  He was called by Plaintiff as a witness to support her
contention that there exists a pattern or practice of
discrimination by the Clinic.

     b.   Stahlnecker testified that some 20 years ago his
application to serve as pastor, at the Church in Guam, was

13

turned down. The witness stated that at the time of that decision, a person, whose identity he cannot recall, told him that he was perceived as someone who sided too much with the locals.

2. <u>Frances Mantanona</u>

a. Mantanona was called by Plaintiff, in her case in chief, as a witness to support the existence of a pattern or practice of discrimination by the Clinic. As the current Administrator at the Clinic, she was also called as a witness by the Defense.

b. Mantanona, a Chamorro, was employed in several administrative positions at the Clinic from 1990 until 2000, ending as the assistant to the Administrator. In those positions, Mantanona held an employment contract providing benefits similar to an IDE package. In 1999, Mantanona was said to be unable to meet her performance expectations by the then-Administrator, Don Weidemann. As a result, the Clinic Board reduced Mantanona's duties, and modified her benefit package to be similar to that of other local hire salaried employees. In February 2000 she resigned from the Clinic, and sought employment at another healthcare clinic on Guam. Mantanona testified that the Clinic did not reduce her benefits because she was Chamorro, and that she has never filed a discrimination claim against the Clinic.

c. Mantanona was rehired by the Clinic Board in August 2004 as Clinic Administrator succeeding Michael Mahoney.

14

1    d.    Mantanona, as Administrator at the Clinic since 2004,

2    testified that there is no general prohibition against providing

3    Chamorros with IDE or IDE-comparable benefits because they are

4    Chamorro.

5    e.    As the current Administrator, Mantanona testified as

6    to the implementation and continuing effects of the immediate,

7    mid-range and long-term cost-saving measures adopted by the

8    Clinic's Ad Council and Board in July 2003 and thereafter.    The

9    Clinic has instituted a number of the intermediate-range

10   measures proposed by the Ad Hoc Committee to effect cost

11   savings, including increasing the workload of the dental

12   hygienist, decreasing the number of staff at the Wellness

13   Center, eliminating the advertising budget, lumping sick leave

14   and regular leave into one category of leave time, and

15   discontinuing the allowance of compensatory time.    The Clinic

16   has also instituted many of the Ad Hoc Committee's proposed

17   long-term measures, including amortization of providers'

18   education loans, monitoring providers' leave requests to ensure

19   full-level staffing at all times, more efficient scanning of its

20   medical records, and eliminating direct phone lines.    Mantanona

21   testified that implementation of the cost-savings measures has

22   effectively improved the financial condition of the Clinic.

23   Mantanona testified that as a result of implementation, the

24   Clinic was able to eliminate an operational loss for the full

25   year of 2003 as well as for the full year in 2004.

26   f.    Plaintiff maintained at trial that Mantanona had been

27

28                                   15

given the Administrator position by the Clinic in 2004, after this lawsuit was filed, because she was a female Chamorro and hiring her would present the Clinic in a better light at trial. In her post trial arguments Plaintiff described this circumstance as an attempt to conceal past practices of discrimination. Plaintiff's argument raises a question of fact. What was the purpose of the Clinic Board when it hired Mantanona in 2004? The trial evidence shows a regular application and hiring process and that Mantanona's qualifications are obvious and impressive. Plaintiff presents no evidence to support its accusation. The Court finds that Plaintiff's contention is not true - Mantanona was hired to serve as the Administrator of the Clinic, not as a litigation ploy.

    g.   Plaintiff makes a parallel argument based on the fact of Mantanona's status as Clinic Administrator - that the Court should reject her testimony as it is biased. This is, again, a question of fact. The Court heard the testimony and observed the demeanor of the witness. Mantanona was a central witness in the trial - called as a witness by both the Plaintiff and the Defendants. She was able to recall the relevant historical events and was fully responsive, forthright, and candid in her testimony. Beyond the accusation of bias, Plaintiff offers nothing to dispute or impeach the testimony presented. The Court rejects the argument of Plaintiff and accepts the testimony of Frances Mantanona as an honest, wholly credible account of her knowledge of the events at issue in this case.

16

3. <u>Dr. Pamina Hofer</u>

a. Dr. Hofer testified that she treated Plaintiff for emotional distress during 2004 and 2005. Dr. Hofer met with Plaintiff approximately eight to ten times during this period and testified that Plaintiff exhibited symptoms of stress including dizzyness, sudden fear without reason, abnormal sleep patterns and difficulty sleeping, lack of appetite, and lack of energy.

4. <u>Roger Natividad</u>

a. Natividad, like Mantanona, was called by Plaintiff in support of her contention of the existence of a pattern or practice of discrimination by the Clinic.

b. Natividad, a Filipino, acted as the Clinic's Maintenance Director. Natividad was reclassified to Maintenance Supervisor in response to complaints by then-Administrator Weidemann of his smoking at the non-smoking clinic facility, and his poor performance on certain jobs. Weidemann sought to terminate Natividad, but was convinced by the then-Associate Administrator Mahoney to instead reclassify Natividad and reduce his benefits. While the reclassification eliminated certain benefits, it maintained his wage at the same level as his annual salary earned as the Maintenance Director. Prior to his reclassification, Natividad received IDE-comparable benefits including the full payment of his daughter's college tuition at Loma Linda University. Natividad has since retired from working at the Clinic, and current Administrator Mantanona testified

17

that although his poor performance, as well as sleeping on the job, became issues towards the end of his employment, the Clinic allowed Natividad to retire with full retirement benefits.

c.    Natividad testified that he did not consider the conduct of the Board, as to his employment, was taken because of his ethnic origin.

5.    <u>Richard Brecht</u>

a.    Richard Brecht, a Caucasian, was employed by the Clinic as a local hire maintenance technician.  The evidence established that after it was found that Brecht had taken drugs from the Clinic without authorization, as disciplinary measures, the Clinic demoted and reclassified him, required him to attend rehabilitation treatment, pay restitution, and reduced his pay.

b.    Plaintiff argued that the relevance of this testimony was to show an atmosphere at the Clinic which treats Caucasians more favorably, on the asserted premise that Richard Brecht was "let off easy" because of his race, Caucasian.  There was no evidence of what the Clinic had done by way of discipline related to any other employee who had engaged in similar conduct.

6.    <u>Jolene Brecht</u>

a.    Jolene Brecht, married to Richard Brecht, is a registered and licensed dental hygienist who works for the Clinic.  She is a Caucasian who relocated to Guam from the United States, and was offered IDE status a few years after she began working at the Clinic.  Brecht declined initial offers to

18

become an IDE, but ultimately accepted based on the Clinic's need for a permanent dental hygienist. Brecht testified that her salary at the Clinic amounts to less than what she would earn in California and Colorado, where she is also licensed to practice. Brecht further testified that as a healthcare provider at the Clinic she helps bring in profits for the Clinic, and that her IDE benefits help make up the pay disparity from her salary at the Clinic and what she would receive as a healthcare provider in the United States.

b. Plaintiff stated that the relevance of this testimony was to show an atmosphere at the Clinic which treats Caucasians more favorably, upon the inference from the circumstances of her IDE appointment that Brecht must have been offered the IDE status because of her race, Caucasian.

7. Plaintiff Julia Borja Emmanuel

a. Plaintiff Emmanuel testified that the action of the Clinic Board on July 10, 2003 caused her demotion, a significant loss in compensation, and long term and severe mental distress. Plaintiff testified that it is her strongly held belief that the Board discriminated against her because she is Chamorro. Plaintiff stated that her belief is supported by a history of discrimination finally resulting in the discriminatory conduct of the Board in July 2003. The Plaintiff's testimony described specific incidents and events that she believes support her case against the Clinic:

• During the early days of Plaintiff's employment, a

19

| | |
|---|---|
| 1 | supervisor at the Clinic would not respond when the |
| 2 | Plaintiff called her by her first name, but insisted that |
| 3 | Plaintiff address her formally, while at the same time she |
| 4 | allowed other Caucasian employees to address her |
| 5 | informally. |
| 6 | • When Frances Mantanona lost her IDE-comparable benefits |
| 7 | package in 1999, the conduct of the Board and of then- |
| 8 | Administrator Weidemann, as to his allegation that |
| 9 | Mantanona was not meeting his expectations, was |
| 10 | discriminatory conduct. |
| 11 | • Jordan Urban, a Caucasian, came from another General |
| 12 | Conference Division to work at Adventist World Radio, a |
| 13 | subsidiary of the Mission, and was granted IDE benefits |
| 14 | when he began working for the Clinic, ten years after his |
| 15 | arrival on Guam. |
| 16 | • When Administrator Mahoney returned to Guam immediately |
| 17 | after the shooting incident at the Clinic in 2001 he |
| 18 | completely ignored the efforts or assistance of Plaintiff. |
| 19 | Mahoney returned to the Clinic after the shooting and the |
| 20 | initial police response. Plaintiff had been present at the |
| 21 | time of the incident and had handled the Clinic's response, |
| 22 | including her identification of the person responsible for |
| 23 | the shooting. Plaintiff states that Mahoney did not rely |
| 24 | on her for information about the shooting and the status of |
| 25 | the Clinic, but instead ignored her and told her to go |
| 26 | away. |
| 27 | |
| 28 | 20 |

- The treatment of Roger Natividad by the Clinic, specifically the loss of benefits, was discriminatory.
- Clinic employees made false statements about Roger Natividad being a poor worker.
- Jolene Brecht received IDE status because she was Caucasian.
- Administrator Mahoney required her to report to CFO Reese in order to belittle her.
- The Clinic and Administrator Mahoney built a false case to show that her HR position was overpaid.
- Administrator Mahoney interfered with her management responsibilities by interfering with her support staff.
- Termination of her husband's janitorial services contract with the Clinic was an act of discrimination.
- After the lawsuit was filed, Church members tried to make her feel guilty for filing the lawsuit.
- The treatment of Richard Brecht's misconduct by the Clinic was less punitive than it would have been if he had not been Caucasian.
- Administrator Mahoney, Jordan Urban and CFO Reese discussing in a meeting that Plaintiff has a "local cultural mind set."
- After the lawsuit was filed, Plaintiff did not receive an invitation to a Clinic Christmas gathering until it was too late to attend.

21

8. <u>Ed Emmanuel</u>

   a.   Ed Emmanuel, Plaintiff's husband, testified that his
janitorial services company lost its contract with the Clinic
after his wife brought this lawsuit.  Plaintiff presented this
testimony as evidence of discriminatory conduct by the Clinic,
and to show that Plaintiff and her family were discriminatory
targets of the Clinic.

   b.   Ed Emmanuel also testified that his wife was
ostracized from the SDA community on Guam after filing this
lawsuit, and testified that the reclassification of Plaintiff's
position has negatively impacted the entire family, and has
directly and negatively effected the emotional state and
stability of the Plaintiff.

9. <u>George Emmanuel</u>

   a.   George Emmanuel, Plaintiff's son, testified that his
mother was ostracized from the SDA community on Guam after
filing this lawsuit, and testified that there were negative
effects from the reclassification of Plaintiff's position on her
emotional state and home life.

F.   <u>Trial Testimony - Clinic Board Members</u>

   There were seven members of the Clinic Board of Directors
present at the meeting of the Board on July 10, 2003.  All of
the members, except the Chairman Pastor Jano, voted on the
decision to demote/reclassify Plaintiff and remove some of her
benefits.  Four of the members, present at the meeting,
testified at the trial - Pastor Jano, Violet Cruz, Michael

22